*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0194p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
——————————

UNITED STATES OF AMERICA,

                      *Plaintiff-Appellee,*

     *v.*

VERNELL D. WILLIAMS,

                      *Defendant-Appellant.*

No. 08-2070

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00249-001—Gordon J. Quist, District Judge.

Argued: June 8, 2010

Decided and Filed: July 8, 2010

Before: DAUGHTREY, GILMAN and SUTTON, Circuit Judges.

——————————

**COUNSEL**

**ARGUED:** Michael D. Oppenheimer, ERICKSON & OPPENHEIMER, Chicago, Illinois, for Appellant. B. René Shekmer, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Michael D. Oppenheimer, Jon F. Erickson, ERICKSON & OPPENHEIMER, Chicago, Illinois, for Appellant. B. René Shekmer, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

——————————

**OPINION**

——————————

SUTTON, Circuit Judge. Vernell Williams challenges his jury conviction for conspiracy to distribute cocaine on a number of grounds, all meritless. We therefore affirm.

I.

Williams grew up in Chicago near Marshon Weaver and Weaver's stepbrother, Homer Holmes. In 2002, Holmes moved to Lansing, where he earned a living selling cocaine. Weaver, Williams and several other acquaintances from Chicago were Holmes' primary suppliers. When Holmes needed a new supply of cocaine, he sent a courier or traveled with a courier from Lansing to Chicago. Once there, Holmes (or the courier) would seek cocaine from Weaver. If Weaver had cocaine, Holmes (or the courier) picked up the drugs at Weaver's residence, which Williams owned.

If Weaver did not have any cocaine, Holmes went to Williams. Typically operating out of his parents' house, Williams sold Holmes between one and two kilograms at a time for $19,000 or so per kilogram. Williams often allowed Holmes to buy cocaine on partial credit, and Holmes would pay Williams back after he sold the drugs in Lansing. If neither Weaver nor Williams had enough cocaine, Holmes bought the drug from other Chicago acquaintances. Holmes' couriers transported the cocaine. They would drive it from Chicago to Lansing, where Holmes would sell the drugs to three main customers, who generally converted it into crack before selling it themselves.

On the evening of March 1, 2005, Illinois police arrested Williams for possessing five kilograms of cocaine. After a series of start-and-stop discussions, in which Williams would ask to talk about the case, expressly waive his rights, then (temporarily) decide he wanted to speak to an attorney, Williams signed a *Miranda* waiver and gave an oral statement to the officers. He confessed to buying cocaine regularly from a man named "Jose," selling ten to twenty kilograms of cocaine a week for the past two years and using his drug profits to purchase a Bentley, among other high-end luxuries. He then wrote a statement addressing that evening's events, explaining: "I meet Jose in Country Club Hills for five kilo and went to my mom's house to meet Pow-Pow. The police pulled up and took me in. The drugs was in the trunk. It was 18,500 per kilo." Tr. 1, 25–26. The State, for reasons of its own, did not prosecute Williams.

The arrest did not slow down Williams' drug business, and neither did the decision not to prosecute him. In 2006, Weaver died in a car accident. With Holmes' primary supplier dead, Holmes bought his cocaine from Williams and another Chicago acquaintance.

Williams began selling Holmes three kilograms of cocaine at a time, two that Holmes paid for up front, one that he bought on consignment. When federal agents caught up with Holmes, he confessed and identified Williams as one of his suppliers.

In October 2007, a grand jury indicted Williams for conspiring to distribute more than five kilograms of cocaine. His co-conspirators, including Holmes and Holmes' Lansing buyers, each pleaded guilty to at least one related drug-conspiracy charge. Williams opted for trial, and a jury found him guilty.

At sentencing, the district court determined that Williams had distributed more than 150 kilograms of cocaine, giving him a base offense level of 38. The district court sentenced Williams at the bottom of the guidelines range, imposing a 292-month sentence.

II.

Williams argues that his 2005 confession to state police was involuntary and thus should not have been admitted at his federal trial. The voluntariness of a confession turns on a variety of circumstances, including "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health," as well as whether the police advised the defendant of his *Miranda* rights and whether the record contains evidence of police coercion. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (internal citations omitted).

The circumstances of Williams' confession do not show involuntariness. At about 11:00 p.m. on March 1, the evening of Williams' arrest, a state officer read Williams his *Miranda* rights. Williams orally waived them but refused to sign the department's waiver form. Williams answered questions for about ten minutes. When the officers asked him to write a statement, Williams said that "he felt uneasy putting anything down . . . without his lawyer." Tr. 1, 108. The officers stopped questioning him and left the interview room.

Several hours later, at roughly 3:00 a.m. on March 2, Williams asked to call his girlfriend, and the officers permitted him to do so. Around 1:00 p.m. the next day, Investigator Christopher Harris brought him a hot meal from McDonald's. Harris brought Williams from his cell to a room with a space for eating. While Williams ate, Harris sat with him and filled out Williams' arrest paperwork. Williams asked Harris if he could talk to him

"regarding the case." Tr. 1, 9. Harris responded that "he should have his counsel present" if he wanted to talk. *Id.* Williams replied, "Hey, man, f[---] that. He works for me. He ain't in jail, and I ain't trying to go to jail." *Id*. Harris asked Williams if he really wanted to speak to him without counsel, to which Williams responded, "Yeah. I can't go back to jail." Tr. 1, 10. Harris left the room to get assistance in taking the statement.

Shortly before 4:00 p.m., Harris and DEA Agent George Ohlin, whom the state police had called to the station, went to Williams' cell. Ohlin read Williams his *Miranda* rights, and Williams signed a waiver form. When Ohlin asked the first question, however, Williams cut him off and said he wanted to have an attorney present. Ohlin ended the interview.

At 10:00 that evening, Williams again asked to speak to Investigator Harris "about the case." Tr. 1, 18. Thinking that Williams was playing games with him, Harris told Williams that, if he wanted to speak, he would have to do so in front of Harris and another investigator, James Bolek. The officers again read Williams his rights, and he again signed a waiver form.

This time, Williams spoke. He described his drug-trafficking activities over the past two years and wrote a short statement about them. The officers contacted a state prosecutor, who came to the station. Around 2:00 a.m. on March 3, the prosecutor read Williams his rights. Williams signed another waiver, and Williams gave nearly an identical oral statement to the prosecutor. The prosecutor asked Williams if he would make a written statement. Williams declined, saying that he thought he should have his attorney with him to do that.

Far from bending his will, the events surrounding Williams' confession suggest that the officers fully respected his constitutional rights and that Williams participated in the interrogation on his own terms from beginning to end. The officers gave Williams his *Miranda* warnings four times. Williams orally waived them each time. And he signed a waiver form three times. When, at various points during the detention, Williams said he did not feel comfortable speaking without an attorney, the police stopped questioning him. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1991). When Williams, not the police, repeatedly re-initiated the conversation by asking to talk about the case, he disclaimed any

interest in having an attorney present. *Id*. On this record, the police permissibly listened to what Williams had to say each time.

The conditions of Williams' confinement point in the same direction. Thirty-four at the time of his arrest, Williams was a high-school graduate who was all too familiar with the criminal justice system, as he already had eight arrests, two convictions and a four-year prison term under his belt. Officers allowed him to call his girlfriend when he asked to, gave him a hot meal, as required by department policy, and left him alone when he no longer wanted to talk to them.

The only fact that cuts the other way is the length of his confinement—24 hours—before he confessed. Taken by itself, this feature of the interrogation might begin to support Williams' argument. *See Davis v. North Carolina*, 384 U.S. 737, 752 (1966) (16 days of repeated questioning led to an involuntary confession); *Culombe v. Connecticut*, 367 U.S. 568, 625–26 (1961) (five days of repeated questioning led to an involuntary confession); *Ashcraft v. Tennessee*, 322 U.S. 143, 153–54 (1944) (36 hours of interrogation "without respite" led to an involuntary confession). But we apply a totality-of-circumstances test in this area, not a singular-fact test, and that makes all the difference. "[I]nterrogations of great[] duration" have been deemed improper only when "they were accompanied . . . by other facts indicating coercion." *See Berghuis v. Thompkins*, ___ S. Ct. ___, slip op. at 15 (2010). And it is not even clear that a 24-hour interrogation amounts to one of "great[] duration." When a suspect repeatedly invokes his *Miranda* rights, then repeatedly waives them, all while being treated fairly and humanely, it should come as no surprise when the encounter spans 24 hours rather than a few hours. There was no evidence of police coercion, and the length of the "interrogation" was a function of Williams' repeated decision to start, stop and start again the dialogue, not the officers' application of the "third degree" or anything approaching it.

Williams does no better in pressing a statutory rather than a constitutional premise for his argument. Invoking a federal statute concerning confessions and delayed presentments, 18 U.S.C. § 3501(c), Williams claims that the district court had no right to admit his confession. His theory proceeds in two steps: (1) The provision says that "a confession" "shall not be inadmissible solely because" federal agents delay presentment to

"a magistrate judge or other officer empowered to commit persons charged with" federal crimes if the confession "was made . . . within six hours immediately following . . . arrest," *id.*; and (2) confessions like his, made more than six hours after arrest and prior to presentment before a magistrate, therefore must be involuntary. This two-step contention has at least three flaws. One, the statute creates a safe harbor for *admitting*, not excluding, confessions. 18 U.S.C. § 3501(c). Two, the statute regulates federal prosecutions and confessions, not confessions made in state custody. At the time Williams confessed, he was held by the *state* police for potential *state* charges, well beyond the reach of the federal statute. *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 352 (1994). Three, the statute was designed to limit the requirement that federal agents promptly present a suspect to a federal magistrate, which has nothing to do (whether as a matter of state or federal custody) with this interrogation and confession. *See Corley v. United States*, 129 S. Ct. 1558, 1570 (2009).

### III.

Even if his confession was voluntary, Williams argues, the district court violated Rule 404(b) of the Federal Rules of Evidence in admitting it. Rule 404(b) prohibits courts from admitting evidence of "other crimes," save under certain exceptions. But Williams' confession—detailing his ongoing drug sales, divulging how he obtained his drug supply and admitting that he had been caught with five kilograms of cocaine in his car—was not evidence of *other* crimes; it was evidence of the *charged* crime: a conspiracy to distribute cocaine. A conspiracy, to be sure, may entail many acts, and many of them may themselves be criminal, but that does not make them "other crimes" presumptively barred from admission under Rule 404(b). Otherwise, it would be possible only to charge someone with a drug-trafficking conspiracy, never to prove it. That is not how Rule 404(b) works.

### IV.

Williams argues that the evidence does not support the verdict. He waived this argument, however, by not renewing his pre-verdict motion for judgment of acquittal at the conclusion of the evidence. *See* Fed. R. Crim. P. 29(a); *United States v. Khalil*, 279 F.3d 358, 368 (6th Cir. 2002). That leaves us with the task of determining only whether the trial resulted in a "manifest miscarriage of justice." *Id.* It did not.

A "manifest miscarriage of justice" is no small matter.  It means that the record is "devoid" of evidence of guilt, *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998), something this record is not.  A drug conspiracy requires:  "(1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009).  All of the key players in Williams' drug business, the record shows, knew each other, many since childhood.  It shows that Weaver, one of the principal drug sellers, lived in and conducted his business out of a house owned by Williams.  Most critically, it describes a supply chain in which Holmes, if unsuccessful in obtaining cocaine from Weaver, could invariably seek it from Williams.  It suggests that Williams had "more than a buyer-seller arrangement" with Holmes, based on his willingness to sell Holmes drugs on partial credit.  *See United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004).  And it indicates, based on Holmes' attempt to return a bad batch of cocaine that his customers could not turn into crack, that Williams knew Holmes was re-selling the large amounts of drugs he bought.  These facts gave the jury plenty of reasons to find Williams guilty.

V.

Williams next claims a fatal variance, a theory of error often raised but seldom seen. In the context of a conspiracy, a variance requires reversal only if (1) "the indictment alleged one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies," and (2) the variance prejudiced the defendant. *United States v. Caver*, 470 F.3d 220, 235–36 (6th Cir. 2006) (quotation marks and alterations omitted). Williams must satisfy an even higher standard here because he failed to raise this contention at trial, constraining us to review the claim under the plain-error standard. *Id.* at 235.

The evidence presented at trial did not depart from the conduct charged in the indictment, much less do so plainly.  The indictment alleged that Williams conspired "to distribute more than 5 kilograms" of cocaine "from in or about 2002 to in or about October, 2007, in the Western District of Michigan, and elsewhere." R.1, 3.  At trial, the government proved just that:  Williams conspired to distribute cocaine "in the Western District of Michigan" (Lansing), "and elsewhere" (Detroit).  Williams insists that the evidence of drugs flowing from Chicago to Lansing and from Chicago to Detroit shows not one overarching

conspiracy but two separate conspiracies. Yet the reality that Williams sold drugs that made their way to Lansing and to Detroit does not mean that Williams was convicted of crimes outside the bounds of his indictment. A conspiracy still counts as "one" conspiracy even if it can be subdivided into multiple parts. *United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999).

## VI.

Williams concludes by arguing that the district court improperly found him responsible for more than 150 kilograms of cocaine at sentencing. Ample evidence supports the district court's finding.

Start with Williams' confession. He admitted to selling ten to twenty kilograms of drugs a week for at least two years. That by itself takes Williams well beyond the 150-kilogram finding. Holmes' testimony at the sentencing hearing comes to the same end. Holmes testified that, beginning in 2001, he obtained "at least two [kilograms] a month" from Chicago (24 per year for one year), that the quantity inched up to four kilograms a month between 2002 and 2006 (48 per year for four years) and that "sometimes" Williams would throw in additional kilograms. In weighing Holmes' testimony, the district court cautiously disregarded some of the sales to Holmes during 2001 and 2002, but even then that left a drug quantity well above 150 kilograms. No error occurred.

## VII.

For these reasons, we affirm.