RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER A. GANDY (17-2020); ANTHONY R. GANDY (18-1106); SHARON GANDY-MICHEAU (18-1137),

*Defendants-Appellants*.

> Nos. 17-2020/18-1106/1137

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:15-cr-20338—Judith E. Levy, District Judge.

Argued: May 1, 2019

Decided and Filed: June 7, 2019

Before: CLAY, GILMAN, and KETHLEDGE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Gary W. Crim, Dayton, Ohio, for Appellant in 17-2020. Deborah A. Solove, Westerville, Ohio, for Appellant in 18-1106. Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Gary W. Crim, Dayton, Ohio, for Appellant in 17-2020. Deborah A. Solove, Westerville, Ohio, for Appellant in 18-1106. Andrew P. Avellano, Columbus, Ohio, for Appellant in 18-1137. Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.   Anthony Gandy, his brother Christopher Gandy, their sister Sharon Gandy-Micheau, and Sharon's husband Durand Micheau sought tax refunds for 21 separate fictitious trusts that they created.  The defendants' scheme was to submit fictitious tax returns to the Internal Revenue Service (IRS) for the purpose of claiming refunds for nonexistent excess withholding.  They were successful in obtaining refund checks based upon many of these returns, receiving over $360,000 in ill-gotten money.  The defendants were convicted of several crimes, including mail fraud, conspiracy to commit mail fraud, aggravated identity theft, conspiracy to commit identity theft, and illegal monetary transactions.

Anthony, Christopher, and Sharon now appeal, arguing that (1) insufficient evidence supports Sharon's convictions, (2) insufficient evidence supports the finding that Anthony and Sharon knew that they were using the names and personal identifying information of real people, (3) Anthony and Christopher were deprived of the effective assistance of counsel because their state-bar grievances against their attorneys created conflicts of interest, (4) the indictment was duplicitous regarding the aggravated-identify-theft charges and the district court failed to cure this defect by issuing a specific unanimity jury instruction, (5) the court's aiding-and-abetting jury instruction was legally incorrect, and (6) insufficient evidence supports the court's aiding-and-abetting jury instruction.  For the reasons set forth below, we **AFFIRM** all aspects of the district court's judgment.

## I.  BACKGROUND

### A.  Factual background

The defendants created trust documents using their own names, their friends' names, or the names of identity-theft victims as trustees, successor trustees, and beneficiaries.  They then obtained an Employer Identification Number (EIN) from the IRS for each trust.  Using these EINs, they submitted fictitious IRS Form 1041s, the form used for income-tax returns for estates and trusts.  These tax returns falsely claimed that substantially more income had been withheld

from each trust than was due in tax liability, and that the trust was accordingly due a refund in the amount of the excess withholding.

On at least 14 occasions, the IRS relied on the veracity of the signed returns, which were submitted under penalty of perjury, and issued refund checks to the fictitious trusts. The checks were generally mailed to Post Office (P.O.) Boxes that the defendants had obtained. Once they received the checks, the defendants deposited the funds into bank accounts that they had created for the trusts, or at supermarkets or check-cashing businesses in Detroit that charged high fees. All told, the defendants requested $1,425,548 in refunds, the IRS issued refund checks totaling $939,103.05, and the defendants netted $360,469.05 from those checks. The defendants were not able to obtain the full $939.103.05 because several of the banks closed the trust accounts before the defendants were able to withdraw all the funds. In addition, the IRS seized two checks sent to a P.O. Box at a UPS store because the owner of the store alerted the authorities about the suspicious checks.

The defendants used their own identities in the early days of the scheme. In June 2012, for example, a Form 1041 was submitted to the IRS on behalf of the Sharon Trust Fund. Sharon's sister Pamela Gandy signed the return and sought a refund of $33,856 for excess withholding. Sharon was listed as the trustee of the fund and the return was mailed by Anthony. Furthermore, the return address was listed as a P.O. Box that was obtained by Sharon using her real driver's license. Sharon also used her real identification to cash the refund check at a supermarket in Detroit.

The defendants then recruited family, friends, and acquaintances to lend their personal information for use in the scheme. For instance, Christopher and his fiancée, Deyana Wagner, submitted a return on behalf of a fictitious C&D Trust. They had the check sent to a P.O. Box rented by Anthony, and then cashed the $35,051.80 check at a check-cashing store in Detroit.

Similarly, Anthony recruited his longtime girlfriend, Sydona Robinson, to submit a fraudulent return. After Anthony established a trust in Robinson's name using her real personal identifying information, he submitted a Form 1041 that claimed a refund of $66,629. Anthony named his friend Derrick McCoy as a trustee and used a P.O. Box that he controlled as the return

address.  McCoy and Anthony deposited the refund check, which Robinson claimed that she never saw, into an account at Fifth Third Bank.

Anthony also had McCoy set up a fictitious trust.  A Form 1041, submitted by Anthony, claimed that McCoy's trust was due a refund of $38,986.  The refund check was mailed to another P.O. Box controlled by Anthony.  McCoy and Anthony cashed the check in Detroit, paying a $1,500 fee.  According to McCoy, Anthony kept almost all the money for himself.

Anthony similarly brought his friend Darry Poole into the scheme, falsely telling Poole that he would help Poole with his taxes.  Instead, Anthony used Poole's personal information to create the Darry Poole Trust, and he then submitted a Form 1041 on behalf of the trust.  Anthony listed himself as the trustee and claimed that the trust was due a $34,888 refund for excess withholding.  The IRS sent a refund check for that amount to a P.O. Box controlled by Anthony, who cashed the check without giving any of the funds to Poole.

Anthony also induced his friend Aaron Maddox to participate in the scheme.  Maddox testified that Anthony had him rent a P.O. Box, which was listed as the return address for several trusts.  Anthony prepared the paperwork to set up a trust in Maddox's name and claimed a refund of $58,386 for the trust, but no funds were ever sent by the IRS.  Maddox's name was used for other fictitious trusts as well, including the Capital One Investment Trust and the Aspen Investment Trust.

Christopher also recruited friends into the scheme.  For instance, he falsely told his friend Brandon Bradley that he could help Bradley get government money to repair houses in Detroit. Bradley gave Christopher his personal information, and Christopher created the Brandon Bradley Trust, seeking a refund of $34,231.  They received the refund check and cashed it at a local check-cashing store, paying a fee of between $4,000 and $5,000.  Bradley kept $5,000 for himself and Christopher kept the rest of the money.

Christopher and Anthony jointly recruited Shanel Seay, who had been friends with both brothers for some time, into the fraudulent scheme.  The brothers set up a trust in Seay's name and submitted a return seeking a refund of $36,550.  No refund was issued for this trust, but the brothers found other ways for Seay to help with the scheme.  For example, they named Seay as

the trustee for a fictitious Deshawntia Moorer Trust.  The Gandy brothers successfully obtained a refund check for this trust, and Seay opened a bank account for the trust and deposited the refund check into the bank account.  Christopher gave Seay the documents needed to open the bank account and deposit the check, and Christopher and Sharon both accompanied Seay to the bank.  Shortly thereafter, Anthony and Christopher directed Seay to withdraw the money from the trust's bank account in a series of withdrawals.

The defendants also used Seay to help with another fraudulent trust.  Christopher falsely told his friend Randi Hardy that he could help her get money to promote her music career.  He then used Hardy's personal information to set up a fictitious trust and filed a return for the trust, seeking a refund of $83,597.  Hardy denied signing the return, but she did admit to helping cash the refund check.  The defendants had Seay accompany Hardy and Hardy's cousin, who was listed as the trustee, to the bank to deposit the refund check.  Seay opened a bank account for the trust and deposited the refund check into the account, but she testified that the Gandys kept almost all the funds for themselves.

In order to run the fraudulent scheme, the defendants had to keep track of the documentation for 21 separate trusts, obtain and track EIN numbers for each trust, complete and file a Form 1041 seeking a refund for each trust, obtain P.O. Boxes to use as the return addresses for the refund checks, open bank trust accounts, and deposit the refund checks.  Sharon rented at least three P.O. Boxes in her name.  Anthony rented several P.O. Boxes himself and controlled several others that he had friends rent in their own names.

Sharon kept digital and written records for many of the fictitious trusts.  During a search of her house, law-enforcement officers found two notebooks containing names, addresses, and identifying information for several identity-theft victims.  They also found additional information regarding dozens of other stolen identities.  Moreover, the law-enforcement officers conducted trash pulls at Sharon's house to confirm that the defendants were running a tax-fraud criminal enterprise.  Through these thrash pulls, they discovered that the defendants had ordered a "For Deposit Only" stamp for one of their fraudulent trust accounts.  The stamp purported to represent the signature of Herbert Coleman White, whose house in Detroit was robbed in 2012.  Law-enforcement officers also found White's driver's license, Social Security card, and other

personal identifying information during their search of Sharon's house. The defendants used White's name and personal information in connection with several of the fictitious trusts that they created in order to obtain fraudulent tax-refund checks.

A number of the names and personal information used during the scheme in fact belonged to people who had their wallets or purses stolen in the Detroit area. The identity-theft victims whose information the defendants used include Deshawntia Moorer, Kjuan Jones, Brandi Shorter, Alania Curry, Holly Sochocki, Rhonda Nolen, Danisha Smith, and Lia Turla. Trusts in the names of Moorer and Nolen were established by the defendants, and the defendants successfully obtained fraudulent tax refunds for these trusts. The defendants also set up trusts in Curry's and Shorter's names and filed fraudulent tax returns seeking refunds. And Jones and Sochocki were identified as trustees of certain trusts. None of these identity-theft victims knew that their names and personal identifying information were being used in the defendants' fraudulent scheme.

## B.  Procedural background

Anthony, Christopher, and Sharon were indicted on multiple counts arising out of their scheme to obtain fraudulent tax refunds on behalf of these fictitious trusts. Durand Micheau (Sharon's husband), Seay, and McCoy were also indicted. Seay reached an agreement to cooperate with the government and testified during the trial. Micheau's case was severed. The Gandy siblings and McCoy were tried together before a jury. McCoy was acquitted, but Anthony, Christopher, and Sharon were convicted on several of the counts charged in the indictment. Anthony was sentenced to 80 months' imprisonment and Christopher and Sharon were each sentenced to 72 months' imprisonment. The district court explained that Anthony's term of imprisonment was longer because of his criminal history. All three defendants and Durand Micheau were also ordered to pay restitution, jointly and severally, in the amount of $360,469.05—the amount of ill-gotten gains they collectively received.

## II.  ANALYSIS

**A.  Sufficient evidence in the record supports Sharon's convictions.**

We begin with Sharon's argument that there is insufficient evidence in the record to support the verdict against her.  At trial, Sharon's counsel did not renew her motion for a judgment of acquittal at the close of the evidence.  *See* Fed. R. Crim. P. 29.  We therefore must determine "only whether the trial resulted in a 'manifest miscarriage of justice.'"  *See United States v. Williams*, 612 F.3d 417, 423 (6th Cir. 2010) (quoting *United States v. Khalil*, 279 F.3d 358, 368 (6th Cir. 2002)).  A manifest miscarriage of justice means that the record is "'devoid' of evidence of guilt."  *Id.* (quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998)).

Sharon was convicted of mail fraud, conspiracy to commit mail fraud, aggravated identity theft, conspiracy to commit identity theft, and illegal monetary transactions.  She argues generally that none of the convictions can stand because the record is devoid of evidence that she had the intent to defraud anyone.  More specifically, she argues that there was no evidence demonstrating that she knew that the trusts she helped set up would be used for illicit purposes.

We are not persuaded that the record is devoid of evidence of Sharon's guilt.  Among other things, she personally cashed a check from the IRS for $33,856 at a supermarket in Detroit.  The check was made out to the Sharon Trust Fund, and she knew the nine-digit EIN assigned to the trust by the IRS.  This refund check was issued because of a tax return filed by the trust and signed by Sharon's sister that falsely claimed that the trust had $33,856 in earnings withheld despite the fact that the trust had no taxable income.  And Sharon did more than just cash refund checks.  She rented P.O. Boxes used to obtain some of the refund checks and went to the bank to assist in setting up fraudulent trust accounts on multiple occasions.

In addition, the evidence found in Sharon's house constitutes proof regarding her knowledge that the refund checks that she cashed were fraudulently obtained.  Law-enforcement officers found her notebooks containing information for several of the fictitious trusts and fraudulent returns.  They also conducted trash pulls, finding a stamp in the name of Herbert Coleman White, an identity-theft victim whom Sharon did not know.  Furthermore,

law-enforcement officers found White's Social Security card and driver's license, as well as the personal identifying information of dozens of other people, in Sharon's house.

Although there was no direct evidence proving Sharon's intent, the jurors heard ample circumstantial evidence from which they could conclude that she knew that the trusts were created for an illicit purpose. "[I]ntent to defraud can be proven by circumstantial evidence and by inferences drawn from the scheme itself." *United States v. Parkes*, 668 F.3d 295, 302 (6th Cir. 2012) (quoting *United States v. Isaiah*, 434 F.3d 513, 519–20 (6th Cir. 2006)). "[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). "And juries are routinely instructed that '[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" *Id.* (alteration in original) (quoting 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions: Criminal § 12.04 (5th ed. 2000)). Such an instruction was provided in the present case.

**B. The record is not devoid of evidence that Anthony and Sharon knew that their scheme used the names and personal information of real people.**

Anthony and Sharon next challenge their convictions on counts 38 and 41 of the indictment, which charged them with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). They argue that the record is devoid of evidence proving that they knew that they were using the names and personal identifying information of real people. Because Anthony and Sharon failed to renew their motions for a judgment of acquittal at the close of the evidence, we review their challenge under the manifest-miscarriage-of-justice standard. *See Williams*, 612 F.3d at 423.

A conviction for aggravated identity theft under 18 U.S.C. § 1028A(a)(1) requires proof of the following elements: (1) the defendant committed a specified predicate felony; (2) the defendant knowingly transferred, possessed, or used a means of identification of another person without lawful authority; (3) the defendant knew that the means of identification belonged to another person; and (4) the transfer, possession, or use was during and in relation to the predicate felony. Sixth Circuit Pattern Jury Instr. 15.04. ("Nonaggravated" identity theft under 18 U.S.C.

§ 1028(a)(7) requires proof of nearly identical elements. But § 1028A(c) enumerates the predicate felonies for aggravated identity theft, whereas, under § 1028(a)(7), "any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law," is a predicate offense. Section 1028A(a)(1) also provides for a mandatory minimum sentence of two years' imprisonment, to be served consecutively with sentences imposed for convictions on other counts. 18 U.S.C. § 1028A(a)(1), (b).)

The predicate felonies in the present case are mail fraud and conspiracy to commit mail fraud, both of which are enumerated as predicate felonies under § 1028A(c). For the crime charged in count 38, the defendants used the names and personal identifying information of Rhonda Nolen and Holly Sochocki. And for the crime charged in count 41, the defendants used the names and personal identifying information of Deshawntia Moorer and Kjuan Jones. But Anthony and Sharon argue that there is no evidence in the record proving the third element of aggravated identity theft—that they knew that they were using the names and personal identifying information of real people.

The government can use circumstantial evidence to demonstrate that a defendant knew that he or she was using means of identification that belonged to another person. "Under [18 U.S.C. § 1028A], the government [is] required to prove beyond a reasonable doubt that [the defendant] knew that the means of identification that he used belonged to another person. The government need not have direct evidence of knowledge; circumstantial evidence can be sufficient." *United States v. Soto*, 720 F.3d 51, 55 (1st Cir. 2013) (citation omitted).

Taking such circumstantial evidence into account, we conclude that the record is not devoid of evidence demonstrating that Anthony and Sharon knew that they were using the names and personal identifying information of real people. This evidence includes the two notebooks found in Sharon's house that had personal identifying information of identity-theft victims. She also had some of these victims' original identification documents. And her trash contained documents and other items demonstrating that she and her husband were using these stolen identities in the fraudulent-tax-refund scheme. In total, law-enforcement officers recovered information in Sharon's house relating to almost 100 different identity-theft victims.

As for Anthony, he listed Rhonda Nolen and Brandi Shorter as authorized users of the P.O. Boxes associated with the Rhonda Nolen Trust. He used the driver's license numbers of Nolen and Shorter in order to open these P.O. Boxes. And law-enforcement officers found personal identifying information for both women in Sharon's house. The defendants repeatedly used identify-theft victims' real names throughout the scheme. They put these victims' names on the false IRS 1041 tax-return forms, on the refund checks that they fraudulently caused the IRS to issue, on the P.O. Boxes to which the checks were sent, and on the bank accounts into which the checks were deposited.

In *United States v. Holmes*, 595 F.3d 1255 (11th Cir. 2010), the defendant similarly argued that the government failed to prove that she knew that she was using the identity of a real person in committing aggravated identify theft. The Eleventh Circuit affirmed Holmes's conviction, holding that her willingness to subject a stolen Social Security card to government scrutiny established that she knew that the Social Security card belonged to a real person. *Id.* at 1258. And the court also held that Holmes's success in obtaining a driver's license and passport in the victim's name showed that she knew that the identifying information used to obtain those documents belonged to another individual. *Id.*

Similarly, in this case, the jury could have found that Anthony and Sharon were confident that they were using the names and personal identifying information of real people because they subjected the names used in their scheme to scrutiny by the IRS, the United States Postal Service, and the banks. Furthermore, utilizing the analysis in *Holmes*, the defendants' success in using the stolen personal identifying information to create trusts, rent P.O. Boxes, and open bank accounts shows that they knew that the personal identifying information belonged to real people.

The defendants, moreover, did not use personal identifying information from only identity-theft victims. They also used the names and personal identifying information of their friends and family in committing their fraudulent scheme. Anthony recruited his friends Darry Poole, Aaron Maddox, and Derrick McCoy, as well as Anthony's longtime girlfriend Sydona Robinson, for their personal identifying information. Christopher also recruited others, including his friends Brandon Bradley and Randi Hardy, as well as his fiancée Deyana Wagner. As the

government argues, this demonstrates that the defendants knew that they had to use the names and personal identifying information of real people in order for their scheme to succeed.

In sum, the government put forth circumstantial evidence from which the jury could have concluded beyond a reasonable doubt that Anthony and Sharon knew that they were using the names and personal identifying information of real people. Nor have the defendants rebutted the government's evidence in any meaningful way. They do not dispute that the names and personal identifying information that they used did, in fact, belong to real people. And significantly, they offer no explanation as to how they could have obtained such information without knowing that it belonged to other individuals. We therefore conclude that the record is not devoid of evidence showing that Anthony and Sharon knew that they were using the names and personal identifying information of real people.

**C. Anthony's and Christopher's state-bar grievances against their attorneys did not create conflicts of interest that prevented the attorneys from providing effective assistance of counsel.**

We now move on to Anthony's and Christopher's argument that their attorneys did not provide effective assistance of counsel because the Gandy brothers each filed state-bar grievances against them. To start, we provide the context for these state-bar grievances.

The trial in this case did not begin until roughly a year and a half after the indictment was issued. Each continuance had been agreed upon by counsel, and the parties filed appropriate stipulations under the Speedy Trial Act. About a month before trial, the defendants filed a pro se document titled "Objections to Stipulations to Continue Trial," in which they complained that they had not personally agreed to the continuances. This document was purportedly signed by Anthony, Christopher, Sharon, Durand Micheau, Derrick McCoy, and Shanel Seay.

The district court overruled the objections on the ground that the defendants were not permitted to proceed pro se because they were represented by counsel. It also noted that the continuances had been agreed to by the parties. Anthony and Christopher then each tried to fire their respective attorneys and sought the appointment of new attorneys. The court conducted a hearing on the matter and ultimately concluded that there was no basis for the substitution of counsel.

Then, the week before trial, Anthony and Christopher filed grievances against their attorneys with the State Bar of Michigan.  In these filings, the Gandy brothers each claimed that they required new counsel in order to preserve their objections under the Speedy Trial Act.  Anthony and Christopher followed up by filing motions for the substitution of counsel the day before the trial was set to begin, claiming that they were being denied the effective assistance of counsel due their attorneys' failure to raise their speedy-trial objections.  At the same time, counsel for Anthony and Christopher each moved to withdraw, claiming that the state-bar grievances had created a conflict of interest between the attorneys and their clients.

The district court conducted another hearing on the matter.  Christopher testified during the hearing that he "asked [his attorney] to file [the motion to dismiss based on the speedy-trial objection] and [the attorney] didn't file it, and that was [Christopher's] issue with [his attorney]."  Anthony and Christopher both testified that their only complaint with their respective attorneys was that the attorneys did not further litigate the speedy-trial objections, which the district court had already overruled.  In fact, Anthony testified that his attorney was otherwise "an excellent attorney."

The district court found that there was no impairment in the defendants' ability to effectively work with their attorneys.  Furthermore, the court repeated its conclusion that the speedy-trial objections had no merit.  The court also noted that the state-bar grievances were "100 percent frivolous" and contrived by the defendants in order to avoid trial.  In addition, the court concluded that counsel's statements that their feelings had been hurt and that their pride had been wounded were nothing more than "theatrics."  The court ultimately determined that counsel had continued to work cooperatively and communicate extensively with their clients even while these motions were pending.  It therefore denied Anthony's and Christopher's motions to substitute new counsel and denied the attorneys' motions to withdraw.

Anthony and Christopher now argue that the state-bar grievances created a conflict of interest that caused them to be denied the effective assistance of counsel. The Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), announced the standard for criminal defendants claiming ineffective assistance of counsel.  "First, the defendant must show that counsel's performance was deficient." *Id.* at 687.  Counsel's performance is deficient when it "[falls]

below an objective standard of reasonableness." *Id.* at 688. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687.

We use a modified version of the *Strickland* framework when the ineffective-assistance-of-counsel claim is based on an alleged conflict of interest. *United States v. Kilpatrick*, 798 F.3d 365, 374–75 (6th Cir. 2015). Under this modified standard, a defendant must point to specific instances in the record and make a factual showing that the attorney and the defendant have inconsistent interests. *Id.* Proving a conflict of interest requires the defendant to show that his attorney had competing obligations and chose to favor one interest over another, to the detriment of the representation of the defendant. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). More specifically, the defendant must show that his attorney's performance was compromised as a result of a competing obligation. *Id.*

Anthony and Christopher have failed to show that their attorneys had a conflict of interest because the state-bar grievances did not create conflicting obligations. The district court found that the grievances were frivolous and that the defendants' speedy-trial objections lacked merit. Claims by the attorneys that their feelings were hurt are not enough to create a conflict of interest, and the court dismissed as hyperbole the attorneys' assertions that they could not exert the "passion" necessary to represent their clients. The court also found that there was no real breakdown in the attorney-client relationship that prevented the attorneys from providing effective assistance. Anthony and Christopher were both able to communicate with their attorneys to assist them in preparing for trial.

Furthermore, if the filing of state-bar grievances was in itself sufficient to create a conflict of interest that would prevent attorneys from providing effective representation, then criminal defendants could habitually abuse this rule. Any defendant in a criminal case would be able to manufacture a frivolous argument against his or her attorney, file a state-bar grievance, and have the district court substitute new counsel. *See United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (noting that a ruling for a defendant claiming ineffective assistance of counsel as a result of a meritless state-bar grievance "would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial").

And even if the grievances in question here had merit, they did not create a conflict of interest because the grievances did not establish any competing obligations for the attorneys.  If anything, they aligned the attorneys' interests with those of their clients and incentivized the attorneys to work even harder.  The attorneys must have recognized that if their clients were convicted at trial, the alleged failure to pursue the speedy-trial objections would be highlighted.  They must have similarly recognized that an acquittal for their clients would render the grievances moot.  *See, e.g.*, *United States v. Leggett*, 81 F.3d 220, 227 (D.C. Cir. 1996) ("[A]n attorney fearing an ineffective assistance of counsel claim has an incentive to do his best, not the contrary.").

Because we conclude that Anthony's and Christopher's state-bar grievances against their attorneys did not create a conflict of interest, we need not address whether the alleged conflict compromised the attorneys' representation of their clients.  But, in short, we note that Anthony and Christopher have failed to show that any of the alleged deficiencies by their attorneys were caused by what they deem to be a conflict of interest.

**D.  There was no plain error with respect to duplicity in the indictment or the lack of a specific unanimity jury instruction regarding the aggravated-identity-theft charges.**

Anthony's next argument, joined by Sharon, challenges the aggravated-identity-theft counts in the indictment on duplicity grounds and challenges the aggravated-identity-theft jury instructions on unanimity grounds.  First, Anthony argues that counts 38 and 41 of the indictment are duplicitous because the government charged several discrete violations in each count.  "An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007) (quoting *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002)).  Second, he argues that the district court failed to give a unanimity jury instruction regarding the aggravated-identity-theft charges.  These arguments raise the same substantive issue, so we will address them together.  *See id.* ("[T]he primary concern [with a duplicitous indictment] is that a defendant may be deprived of his right to a unanimous jury verdict.").

Anthony and Sharon did not raise the duplicity challenge to the indictment before the district court.  They also did not request a specific jury instruction on unanimity for the

aggravated-identity-theft charges.  We therefore review these arguments under the plain-error standard.  *Id.* at 445 ("[W]hen a defendant raises a challenge to a duplicitous indictment for the first time on appeal . . . [and w]here the defendant does not object to the district court's instructions to the jury, review is limited to plain error.").  Under the plain-error standard, "we must consider whether there was plain error that affects substantial rights and that, in our discretionary view, seriously affects the fundamental fairness, integrity, or public reputation of judicial proceedings."  *United States v. Barnett*, 398 F.3d 516, 525 (6th Cir. 2005) (citing *Johnson v. United States*, 520 U.S. 461, 466 (1997)).

Anthony argues that the indictment is duplicitous regarding counts 38 and 41, and that the jury instructions failed to cure this defect.  Specifically, he contends that each of these counts alleged more than one predicate offense and more than one victim.  Count 38 refers to the victims as Individuals C and D—later identified as Rhonda Nolen and Holly Sochocki.  And count 41 refers to the victims as Individuals H and I—later identified as Deshawntia Moorer and Kjuan Jones.  Anthony relies primarily on *United States v. Duncan*, 850 F.2d 1104 (6th Cir. 1988), in support of his argument that the verdict must be unanimous regarding the predicate offense and the victim.

This court held in *Duncan* that a jury verdict must be unanimous as to which false statement violated 26 U.S.C. §§ 7206(1) and 7602(2), statutes that prohibit the making and preparing of a tax return containing a materially false statement.  *Id.* at 1113.  We also held that the distinct court was required to use a specific unanimity jury instruction when faced with the genuine risk of a nonunanimous verdict.  *Id*. at 1113–14.  The problem with *Duncan*, however, is that this court in *United States v. Schmeltz*, 667 F.3d 685, 688 (6th Cir. 2011), noted that *Duncan* had been abrogated by *Schad v. Arizona*, 501 U.S. 624 (1991).  In *Schad*, the Supreme Court recognized "a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed."  *Id.* at 631.

The Court in *Schad* further noted as follows:

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in

litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.

*Id.* at 631–32 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring) (footnotes omitted)). Because *Duncan* has been abrogated, Anthony has not pointed to any binding precedent that establishes that each victim of identity theft must be the subject of a separate charge or that a jury verdict must be unanimous regarding the victim of identity theft.

Furthermore, based on the evidence presented at trial, no reasonable juror could have found that Anthony and Sharon used the name and personal information of Rhonda Nolen but not of Holly Sochocki, or vice versa, because the two names were used together on the same instruments. The Form 1041 submitted for the Rhonda Nolen Trust, for instance, identified Holly Sochocki as the trustee. And the refund check listed both Nolen and Sochocki.

The same is true for count 41 regarding Deshawntia Moorer and Kjuan Jones. For the Deshawntia Moorer Trust, the Form 1041 listed Deshawntia Moorer and Kjuan Jones on successive lines. And the refund check also listed both names. Because no reasonable juror could have found that one name was used but not the other, there was no risk of a nonunanimous verdict regarding the multiple victims named in each count. *See United States v. Kakos*, 483 F.3d 441, 446 (6th Cir. 2007) (observing that, where the defendant was charged in a single count with knowingly receiving both a stolen trailer and the meat contained in the trailer, his argument that some jurors might have concluded that he knew only that the trailer was stolen, whereas others might have concluded that he knew only that the meat was stolen, was inconsistent with the evidence). Accordingly, there was no plain error on duplicity grounds regarding the indictment naming multiple victims in counts 38 and 41, and the district court was not required to issue a specific unanimity instruction on this issue.

We will now address Anthony's argument that the indictment was duplicitous because counts 38 and 41 listed multiple predicate felonies. Each count alleged that the crimes of aggravated identity theft were committed "during and in relation to the offenses of conspiracy to commit mail fraud and mail fraud."

Even assuming that the district court erred in not providing a specific unanimity instruction for the aggravated-identity-theft counts regarding the predicate felonies, there was no issue with respect to unanimity. The jury unanimously found both Anthony and Sharon guilty of conspiracy to commit mail fraud, which was one of the predicate felonies for aggravated identity theft. Anthony was acquitted of the predicate substantive-mail-fraud offenses in counts 10, 14, 28, and 31. So we know from the verdict that the jury unanimously believed that the only predicate offense that Anthony was guilty of is conspiracy to commit mail fraud.

True enough, Sharon was convicted of the substantive-mail-fraud offenses in counts 10 and 28 for the Nolen Trust. But that does not present an issue regarding whether the jury's verdict was unanimous for the aggravated-identity-theft charges in counts 38 and 41 because the jury unanimously believed that Sharon committed the predicate offenses of both mail fraud and conspiracy to commit mail fraud. We therefore have no concern that some jurors found Sharon guilty of only the predicate offense of mail fraud, whereas others found her guilty of only the predicate conspiracy offense. The jury found her guilty of both offenses. In sum, Anthony and Sharon were not "deprived of [their] right to a unanimous jury verdict." *See Kakos*, 483 F.3d at 443.

**E.  The district court did not commit plain error regarding its aiding-and-abetting jury instruction for aggravated identity theft by not specifying that a defendant must willfully cause another person to commit *every* element of aggravated identity theft.**

This brings us to the first of Anthony's arguments, joined by Sharon, challenging the district court's jury instruction regarding aiding-and-abetting liability. Anthony contends that the court erred in its jury instruction because it did not specify that a defendant must have knowledge that another person would use a real identity-theft victim's personal information.

Specifically, Anthony argues that, under *Rosemond v. United States*, 572 U.S. 65 (2014), the district court must instruct the jury that aiding-and-abetting liability applies only if the defendant takes an affirmative act in furtherance of the underlying offense with the intent to facilitate that offense's commission. *See id.* at 71, 76. The defendant, Anthony contends, must have knowledge that another person will commit each element of the crime in order to be found guilty. *See id.*

*Rosemond* concerned aiding-and-abetting liability under 18 U.S.C. § 924(c), which criminalizes using a firearm "during and in relation to" a drug-trafficking crime or a crime of violence. The Supreme Court held that "intent must go to the specific and entire crime charged," *i.e.*, "the full scope (predicate crime plus gun use) of § 924(c)." *Id.* at 76. Anthony argues that the same reasoning applies in the present case because aggravated identity theft under 18 U.S.C. § 1028A(a)(1) is also a compound crime that requires the commission of a criminal act—transferring, possessing, or using a means of identification of another person without lawful authority—"during and in relation to" a predicate offense. Applying the principles articulated in *Rosemond* to the present case, Anthony argues that the jury instructions improperly failed to specify that he could be found guilty of aiding and abetting only if he knew that another person would use a real identity-theft victim's personal information.

If an objection to a jury instruction was not preserved before the district court, we review the instruction under the plain-error standard, "considering whether 'the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice.'" *United States v. Wood*, 364 F.3d 704, 708 (6th Cir. 2004) (quoting *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992)). Anthony argues that his objection was preserved, but before the district court he challenged only the sufficiency of the evidence to support an aiding-and-abetting instruction. That argument is raised again on appeal. *See* below, Part II.F. But none of the defendants argued before the district court that the aiding-and-abetting instruction itself was legally incorrect. Accordingly, we review the district court's instruction under the plain-error standard.

The district court instructed the jury on aiding-and-abetting liability for aggravated identity theft as follows:

> First, that the defendant caused any person to commit the act of knowingly using without lawful authority a means of identification of another individual;
>
> Second, if the defendant had committed the act, it would have been the crime of Aggravated Identity Theft;
>
> Third, that the defendant willfully caused the act to be done.
>
> Proof that the defendant may have known about the crime, even if he or she was there when it was committed, is not enough for you to find him or her guilty. You

may consider this in deciding whether the government has proved that he or she caused the act to be done, but without more it is not enough. What the government must prove is that the defendant willfully did something to cause the act to be committed.

The second element negates Anthony's objection based on *Rosemond* because the district court had already instructed the jury on the crime of aggravated identity theft using the proper elements. Among those elements was the requirement "that the defendant knew the means of identification belonged to another person." Accordingly, the jury instructions as a whole were sufficiently clear that, in order for the jury to find Anthony or Sharon guilty of aggravated identity theft under an aiding-and-abetting theory of liability, it would have to find that he or she willfully caused another person to use someone else's identification without lawful authority, knowing that the identification used belonged to someone else. We thus find no plain error in the aiding-and-abetting jury instruction.

**F. Sufficient evidence justified the district court's aiding-and-abetting jury instruction for aggravated identity theft.**

This leads us to Anthony's next argument, also joined by Sharon, challenging the sufficiency of the evidence to support the district court's aiding-and-abetting jury instruction. The government acknowledges that this objection was preserved, so we review the court's decision to include the instruction under the abuse-of-discretion standard. *United States v. Eaton*, 784 F.3d 298, 306–07 (6th Cir. 2015). "Under this standard, we 'review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision.'" *Id.* (quoting *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008)).

Anthony argues that he had no role in the tax returns, the EIN numbers, or the trust documents regarding the Rhonda Nolen and Deshawntia Moorer Trusts. But the evidence shows otherwise. For the Rhonda Nolen Trust, for instance, Anthony rented a P.O. Box in November 2012 and listed Nolen as an authorized recipient. That same day, somebody prepared a fraudulent tax return for the trust using Nolen's forged signature and sent the return to the IRS. The fraudulent return requested that a refund check be sent to the P.O. Box opened by Anthony. Anthony went to the bank with Christopher when Christopher set up the bank account for the

Nolen Trust.  Then, when the check arrived in the P.O. Box rented by Anthony, Anthony and Christopher took the check to the bank to deposit it into the account that they had opened.

Anthony points out that the surveillance photo from the bank depicts him departing carrying a sheaf of papers, which he claims was a newspaper.  But when somebody enters a bank empty handed, opens a trust account, then leaves carrying a sheaf of papers, the most logical inference is that these papers relate to the new account.  A reasonable jury could conclude from these facts that Anthony either prepared the false return, forged Nolen's signature, and mailed the return to the IRS himself, or that he caused another person to commit these acts.  In sum, the district court did not abuse its discretion in deciding to use an aiding-and-abetting instruction with regard to count 38 because Anthony would be liable whether he prepared the false tax return himself or whether he caused another to do so.

Evidence in the record also supports the aiding-and-abetting instruction regarding count 41, the aggravated-identity-theft count relating to the Deshawntia Moorer Trust.  As with the Rhonda Nolen Trust, Anthony procured the P.O. Box to which the refund check for the Moorer Trust was sent.  He recruited Poole to help with this task.  The Moorer Trust designated Seay as the trustee, and she testified that Anthony and Christopher were responsible for her involvement in the criminal scheme.  Seay was accompanied by Christopher and Sharon when she took the check bearing Moorer's and Kjuan Jones's names to the bank to deposit it.  And she testified that Anthony demanded that she make withdrawals from the account, with the money going to him. A reasonable juror could find that one of the defendants caused somebody else to create and mail the fraudulent IRS return for the Moorer Trust.  The district court therefore did not abuse its discretion in instructing the jury on aiding-and-abetting liability under 18 U.S.C. § 2(b) for the count 41 aggravated-identity-theft charge.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** all aspects of the district court's judgment.