RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0134p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER SIMPSON (23-3311); MARQUISE FIGURES
(23-3331); ANTUAN L. WYNN (23-3333),

*Defendants-Appellants*.

Nos. 23-3311/3331/3333

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:20-cr-00828—Jack Zouhary, District Judge.

Decided and Filed:  May 21, 2025

Before:  CLAY, THAPAR, and READLER, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Steven D. Jaeger, HEMMER WESSELS MCMURTRY, Ft. Mitchell, Kentucky, for Appellant in 23-3311.  Sanford A. Schulman, Detroit, Michigan, for Appellant in 23-3331. Benton C. Martin, FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellant in 23-3333.  James A. Ewing, Jason Manion, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

CHAD A. READLER, Circuit Judge.  Officers discovered a large-scale drug distribution scheme operating in Toledo, Ohio.  From those revelations, Christopher Simpson, Marquise Figures, and Antuan Wynn were charged with a host of federal crimes related to trafficking in

cocaine, cocaine base, and fentanyl.  The three defendants were tried in a joint proceeding.  And except as to one charge against Wynn, the jury returned guilty verdicts as to all three.

In this consolidated appeal, defendants challenge their convictions as well as their resulting sentences.  For the reasons that follow, we affirm.

I.

A taskforce of federal and local law enforcement officers in Toledo learned that Jackie Green was distributing narcotics in the city's north end.  Further investigation revealed a complex web of interdependent drug trafficking activity among Green and his associates involving powder and crack cocaine as well as fentanyl.

A leading figure in the distribution scheme was Anthony Duff, a self-proclaimed "middleman king" in the Toledo drug trade.  Duff bought fentanyl from Green for resale. Transactions went in the other direction as well, albeit for a different narcotic, with Duff supplying powder cocaine to Green for resale.  As evidence at trial later showed, Duff and Green were at the center of a vast drug distribution chain wherein a number of individuals supplied bulk drug amounts to Duff or Green, with others then obtaining those drugs and reselling them to end users.

In this vein, Duff utilized a host of associates to further his efforts.  Among those in his criminal network were Antuan Wynn, a childhood friend and one of Duff's key sources for cocaine. Over the course of several months, Duff regularly purchased large quantities of powder cocaine from Wynn and regarded Wynn's supply as superior to his other suppliers' product.  In one instance, Duff and Wynn separately pooled their money to buy a kilogram of cocaine.  They worked closely with each other in these ventures.  For example, Duff would tell Wynn what his retail drug distributors needed, and Duff would procure the necessary amounts.  Duff would warn Wynn of potential police activity.  Wynn would also front drugs to Duff.  When Duff did pay Wynn cash for the cocaine, Wynn was not concerned that Duff would short him.

Another figure in the conspiracy was Marquise Figures, who helped Duff distribute drugs to consumers.  Over a six-month period, Duff sold Figures a quarter-ounce or a half-ounce of

cocaine every week or two. And Figures, as well as his purchasers, would, in turn, sometimes cook the powder cocaine into crack for redistribution.

But where was Green obtaining the fentanyl he sold to Duff and others? A phone call between Green and Duff offered a clue. During the call, Green told Duff that he had sold his 2018 blue Dodge Charger for 330 grams of fentanyl and $5,000 in cash. Officers were familiar with the Charger, having previously obtained a warrant to attach a GPS tracker to the vehicle. Upon learning of the sale, agents, aided by the GPS tracker, found the vehicle parked on Pomeroy Street, with Christopher Simpson sitting in the driver's seat. Simpson, it turns out, was no stranger to the taskforce. He had been heard in earlier-traced phone calls purchasing powder cocaine from Green to convert into crack cocaine for retail sale. Simpson's relationship with Green was thus both as a customer and supplier, as the incident with the Charger revealed. Officers arrested Simpson and impounded the vehicle. During an inventory search of the car, officers discovered Percocet pills and marijuana.

Presented with the taskforce's findings, a grand jury indicted 27 individuals on various drug crimes, including Duff and Green, the most prominent members of the alleged criminal network. Most defendants entered guilty pleas. But Simpson, Figures, and Wynn opted to go to trial. Each faced a charge of conspiring with 12 other defendants from December 2019 until November 2021 to distribute controlled substances in violation of 21 U.S.C. § 846. They likewise faced at least one charge each of using a telecommunications facility to facilitate a drug felony in violation of 21 U.S.C. § 843(b). Wynn was separately charged with violating 18 U.S.C. § 922(g)(1) for possessing a firearm as a felon and 21 U.S.C. § 841(a)(1) for distributing cocaine on or around November 12, 2020. Wynn pleaded guilty to the § 922(g)(1) charge, leaving the remaining charges to be resolved at the ensuing consolidated trial. At the trial's close, the jury returned guilty verdicts on all charges, save for the cocaine distribution charge against Wynn. The district court sentenced Simpson and Wynn to within-Guidelines sentences of 300 and 224 months respectively. Figures, for his part, received a below-Guidelines sentence of 70 months. All three defendants filed timely appeals.

II.

We begin with Christopher Simpson, who challenges his conviction on constitutional grounds and his sentence due to purported procedural flaws.

A. Invoking the Fourth Amendment, Simpson challenges the district court's motion-to-suppress ruling regarding the seizure of the Dodge Charger and the subsequent search of the car. In considering the issue, we review the district court's legal conclusions with fresh eyes, while considering any of its factual findings for clear error. *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023).

The Fourth Amendment familiarly protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. With "reasonableness" being the "touchstone" of our analysis, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quotation omitted), several considerations guide whether the seizure and search of the Charger—itself an "effect" for Fourth Amendment purposes, *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976)—were unreasonable. In view of historical concerns over evidence in a vehicle being whisked away before law enforcement can secure a warrant, we allow warrantless searches of an automobile if officers have probable cause (i.e., a "fair probability") to believe the car contains evidence of a crime. *Carroll v. United States*, 267 U.S. 132, 150–54 (1925) (discussing founding era legislation empowering customs officials to search ships for contraband); *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998). This right extends to instances where the vehicle itself, as opposed to its contents, is the contraband sought. *Florida v. White*, 526 U.S. 559, 565 (1999). Accordingly, officers may lawfully seize an automobile from a public place when they have probable cause to believe that the vehicle is forfeitable contraband. *Id.* at 566. And once the vehicle is impounded, officers may conduct an inventory search without violating the Fourth Amendment. *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007).

Taken together, these principles licensed the officers' stop and search of the Charger acquired by Simpson. Consider first the seizure. Officers knew from recorded conversations that Green, a known drug dealer, had traded his blue Charger for 330 grams of fentanyl and cash.

This evidence alone made it fairly probable that the car had been used to facilitate the distribution of a controlled substance, rendering the vehicle forfeitable contraband under federal and state law. *See* 21 U.S.C. § 853(a)(2); Ohio Rev. Code Ann. § 2981.02(A)(1) (West 2025). To effectuate the seizure, officers used a warrant-backed GPS tracker to identify the Charger's location. *See White*, 526 U.S. at 565–66. After discovering and seizing the vehicle in a public place, officers then proceeded to conduct an inventory search of the car in accordance with Toledo Police Department tow policy. In the end, all of this was by the books. *See Smith*, 510 F.3d at 651.

Simpson resists this conclusion on several fronts. He first contends that officers had no right to utilize the GPS device once they learned the car to which it was attached had a new owner. But the warrant permissibly allowed officers to use a tracking device on the Charger without respect to the vehicle's ownership. Probable cause for a search warrant, after all, need not "be tied to any particular person." *United States v. Gibson*, 996 F.3d 451, 462 (7th Cir. 2021) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also United States v. Sanchez-Jara*, 889 F.3d 418, 421 (7th Cir. 2018) (recognizing no constitutional flaw with "a warrant authorizing a GPS device that enables police to track the location of a moving car" no matter where it goes). Nor were officers required to obtain a new warrant once Simpson took possession of the vehicle, which was previously (and lawfully) equipped with a tracking device. *See United States v. Jones*, 565 U.S. 400, 404, 409–10 (2012) (recognizing no physical trespass amounting to a Fourth Amendment search when a tracking device had been lawfully placed on a vehicle before coming into the defendant's possession); *see also United States v. Knotts*, 460 U.S. 276, 278 (1983); *United States v. Karo*, 468 U.S. 705, 712 (1984).

Perhaps, as Simpson emphasizes, officers did not have probable cause to understand that the vehicle would contain evidence of a crime. Either way, that is not the relevant inquiry. With officers having demonstrated probable cause that the Charger itself was contraband, officers were justified in seizing the vehicle. *See White*, 526 U.S. at 565–66. Simpson's view that the seizure of the car was pretextual not only belies the record, but is also irrelevant in the probable cause context, where officers' subjective motives "play no role." *Whren v. United States*, 517 U.S. 806, 813 (1996).

B. Up next are Simpson's challenges to his sentence.  To his mind, the district court miscalculated the advisory guidelines range, and likewise failed to adequately explain its underlying determinations.  Both arguments are flavors of procedural reasonableness.  *See United States v. Coppenger*, 775 F.3d 799, 803 (6th Cir. 2015).  When preserved, we typically review such arguments for an abuse of discretion, requiring a legal error, a clearly erroneous factual finding, or an obvious error of judgment for reversal.  *See United States v. Hymes*, 19 F.4th 928, 932–33 (6th Cir. 2021).  *But see United States v. Tripplet*, 112 F.4th 428, 432 (6th Cir. 2024) (recognizing that specific guidelines provisions often come with their "own standards of review").  Unpreserved arguments are subject to plain error review, *Hymes*, 19 F.4th at 933, requiring a showing of (1) an error, (2) that was obvious or clear, (3) that affected substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings, *United States v. Johns*, 65 F.4th 891, 893 (6th Cir. 2023).

1. Simpson asserts that the district court erred in applying a base-offense level of 32 under § 2D1.1(c)(4) of the Sentencing Guidelines.  Turn then to § 2D1.1.  It instructed the court to set the base-offense level for Simpson's drug crime based on the quantity of drugs involved.  U.S. Sent'g Guidelines Manual § 2D1.1(a)(5), (c)(4) (U.S. Sent'g Comm'n 2024) [hereinafter Guidelines].  Two aspects of that analysis bear emphasis here.  One, while the relevant quantity would typically account for drugs in which Simpson was "directly involved" in trafficking, it can also include other narcotics, such as those that were "reasonably foreseeable" to him to be distributed as part of the conspiracy.  *United States v. Gardner*, 32 F.4th 504, 524 (6th Cir. 2022) (quotation omitted).  Two, the government must prove the weight of the drugs Simpson possessed by a preponderance of the evidence.  *United States v. Histed*, 93 F.4th 948, 955 (6th Cir. 2024).  Reasonable estimates suffice.  *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020).  Given the fact-based nature of this inquiry, we may reverse only if the drug-quantity determination is clearly erroneous.  *Id.*; *see also United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022) (explaining that we uphold the chosen quantity as long as it is "plausible on the record as a whole").

The district court did not commit clear error in finding that Simpson was responsible for at least 1.2 kilograms (but less than 4 kilograms) of fentanyl, resulting in a base-offense level of

32. Guidelines, *supra*, § 2D1.1(c)(4). As a starting point, Simpson accepts that 650 grams of fentanyl is "directly connected" to him. Now consider an incident involving Simpson and Jeremiah Mims, addressed in detail at numerous points in the district court proceedings, including sentencing. Mims, a codefendant and drug dealer, testified that Simpson, his longtime friend, was his source for fentanyl. Mims referenced an incident where Simpson brought a "brick"—that is, 1 kilogram—of blue fentanyl to Mims's store on Main Street, portions of which Mims purchased for resale. Mims then identified pictures of drugs found on his iPhone as depicting the fentanyl brick trafficked by Simpson. Just after his transaction with Simpson, Mims, in a recorded phone call, bragged to Duff that he had access to Simpson's brick of fentanyl. Simpson's girlfriend separately testified that she saw Simpson take a kilogram of fentanyl to Mims at the Main Street location. Adding the 1 kilogram from the Main Street incident to the accepted quantity of 650 grams puts the amount of fentanyl attributable to Simpson well north of the 1.2 kilogram threshold to justify the base offense level of 32. With that in mind, whether other amounts were mistakenly credited to Simpson has no bearing on our review of his sentence. *See United States v. Gill*, 348 F.3d 147, 155 (6th Cir. 2003) (holding any error as to drug amount harmless where "the sentence either way is subject to the *same* guideline range").

Simpson offers two responses. First, he renews an argument he made in district court: it is "speculative" both that the "brick" of drugs from the Main Street incident belonged to him, and that the "brick" was fentanyl. But ample evidence—Mims's testimony, the photo of the drugs, the evidence from the wire interception, and the corroboration from Simpson's girlfriend—makes the district court's findings on these fronts more than plausible. *See Estrada-Gonzalez*, 32 F.4th at 614; *see also United States v. Guerrero*, No. 23-1570, 2024 WL 3427204, at *6 (6th Cir. July 16, 2024) (recognizing evidence supporting a drug quantity finding must merely have "some minimal indicium of reliability beyond mere allegation") (quoting *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992) (en banc)). Quibbles with the credibility of the trial testimony is beyond the realm of clear error review. *See United States v. Mosley*, 53 F.4th 947, 962 (6th Cir. 2022); *see also United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004) (recognizing co-conspirator's testimony can establish drug quantity estimate).

Shifting gears, Simpson asserts that the district court did not sufficiently explain its findings on the drug quantity, a purported procedural error. *See Histed*, 93 F.4th at 963 (Murphy, J., concurring in part and dissenting in part) (distinguishing between the procedural requirement of having the district court "show its work," from the substantive requirement of choosing a plausible estimate of the drug quantity). But Simpson never objected in district court to the adequacy of the court's explanation, meaning we review for plain error. *See United States v. Bradley*, 897 F.3d 779, 785 (6th Cir. 2018). And we see no obvious error with the scope of the district court's explanation. *See, e.g.*, *United States v. Ward*, 68 F.3d 146, 150 (6th Cir. 1995) (deeming findings that reference drug quantities in the presentence report and trial testimony sufficient). Equally true, given the nature of the record evidence, we doubt that a remand for a more fulsome explanation would change the outcome here. *See Bradley*, 897 F.3d at 785 (holding no violation of defendant's substantial rights where the record "amply supports" a court's conservative estimate).

2. Simpson lastly challenges his obstruction of justice enhancement imposed in accordance with § 3C1.1 of the Sentencing Guidelines. Section 3C1.1 generally allows a district court to increase the offense level if a "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." Guidelines, *supra*, § 3C1.1. The district court did so here based on an alleged threat Simpson made to Green to avoid mentioning the sale of the Charger to authorities.

Simpson wisely concedes that threatening a codefendant suffices to apply the enhancement. *See United States v. Parsons*, 798 F. App'x 922, 927 (6th Cir. 2020); *see also* Guidelines, *supra*, § 3C1.1 cmt. n.4. He instead challenges a historical fact underlying the enhancement—namely, whether he threatened Green. We review the district court's assessments of historical facts for clear error. *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). On that front, the district court was presented with the probation office's finding that, based on Green's proffer, Simpson had threatened Green. The court was entitled to rely on those facts unless Simpson presented evidence casting doubt on the reliability or correctness of the probation office's finding. *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003); *see also*

Fed. R. Crim. P. 32(i)(3)(A).  Simpson never did so.  Rather, he simply denied ever threatening Green, labeling Green a liar without elaboration.  Such a bare denial cannot put the issue of whether Simpson threatened Green into dispute.  *United States v. Cover*, 800 F.3d 275, 279 (6th Cir. 2015) (per curiam).

That leaves Simpson's remaining argument that the district court failed to sufficiently explain its reasons for applying the obstruction enhancement.  But here again, Simpson never made this argument in district court. So plain error review applies.  *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc).  And given the threadbare objections to the probation office's findings, we do not see obvious error in the district court's appropriately limited remarks on the obstruction enhancement to warrant a do over.  *See Rita v. United States*, 551 U.S. 338, 356 (2007) (recognizing that "straightforward, conceptually simple arguments" at sentencing require only brief explanations by the district court).

III.

Next up is Marquise Figures, who, recall, was one of Duff's distributors.  He challenges both his conviction and his sentence.

A.1.  Beginning with his conviction, Figures first argues that the district court erred in permitting the government to introduce evidence that he had drugs and cash on his person at a traffic stop on January 1, 2021.  We review that decision for an abuse of discretion.  *United States v. Mack*, 258 F.3d 548, 553 n.1 (6th Cir. 2001).  To support his argument, Figures points to Federal Rule of Evidence 404(b).  In general, the rule prohibited the government from using evidence of a different "crime, wrong or act" to prove Figures's "character" for purposes of showing that he acted "in accordance with the character" for the charged crime.  Fed. R. Evid. 404(b)(1).  But when the challenged evidence is "intrinsic" to the crime charged, Rule 404(b) simply does not apply.  *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995).  And here, the evidence Figures challenges was not evidence of another crime; it was evidence of his charged conspiracy.  His January 2021 arrest happened in the middle of the charged conspiracy, which did not end until November 2021.  Indeed, on the day of his arrest, Figures was attempting to text his supplier Duff to obtain more product.  So the evidence gathered at his arrest—all

suggesting that Figures was continuing to engage in drug trafficking—was intrinsic to the crime charged. *See Barnes*, 49 F.3d at 1149 (recognizing that evidence gathered during an alleged conspiracy does not implicate Rule 404(b)).

2. Turn next to Figures's sufficiency challenge to his conspiracy conviction. Overturning a jury verdict on appeal is no easy task. At this stage, after construing all the evidence in favor of the government, we simply ask whether the jury "behaved irrationally in concluding beyond a reasonable doubt that" Figures conspired to distribute controlled substances. *United States v. Miller*, 982 F.3d 412, 440 (6th Cir. 2020); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

We see no such irrationality. To prove Figures's participation in a drug conspiracy, the government must show three things: "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the" same. *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019) (quotation omitted). Figures targets the "agreement" element, maintaining that he was simply the end purchaser of drugs from Duff. In so doing, Figures invokes the longstanding rule that a "buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy." *Mosley*, 53 F.4th at 960 (quotation omitted); *see also United States v. Wheat*, 988 F.3d 299, 307–08 (6th Cir. 2021) (discussing the exception's common law origins).

Yet the buyer-seller exception is "narrow." *Wheat*, 988 F.3d at 308. It can be overcome with evidence of an implicit agreement to distribute drugs to at least one other person. *Id.* And here, there was ample evidence for the jury to conclude the exception was not at play. Most notably, Figures confessed to officers that in 2020 he routinely purchased and then resold narcotics from Duff. And his purchasers, he added, would sometimes cook the powder cocaine into crack for redistribution. Duff corroborated as much, testifying that he sold Figures a quarter-ounce to a half ounce of cocaine every two weeks for roughly six months. Other testimony confirmed that quarter or half ounce amounts of cocaine were not personal use quantities. From this, a rational jury could easily conclude that Figures committed federal drug conspiracy. *See Mosley*, 53 F.4th at 960 (evidence of repeated drugs transactions extending over a period of time allow for the "eminently reasonable" inference that the defendant contemplated downstream drug sales).

B.1.  Figures also challenges his sentence, portraying the district court's decision-making as procedurally unreasonable.  Like Simpson, Figures says the district court clearly erred in assessing the drug quantity that drove the base offense level.  At sentencing, the government urged a base offense level of 24, a position the district court ultimately accepted.  To get there, the government needed to show by a preponderance of the evidence that at least 100 kilograms of covered narcotics, which includes at least 28 grams of cocaine base, were attributable to Figures.  *See* Guidelines, *supra*, § 2D1.1(c)(8).  The findings from the probation office, which the district court adopted, did far more than that.  Relying on Duff's testimony about how frequently he sold powder cocaine to Figures to convert to crack and how much powder cocaine was involved in each sale, the probation office provided a reasonable estimate that Figures was responsible for 189 grams of cocaine base.  The probation office further included various drugs found in Figures's car during his arrest, to get to a total amount of 689.61 kilograms of covered narcotics—nearly seven times what was needed for a base offense level of 24.  *Id.*  (To get to the 689.61 kilogram total, the probation office, faced with calculating a combination of different narcotics, used the guidelines drug conversion tables found in the commentary to § 2D1.1.  *Id.* cmt. n.8(D).  Using the conversion of 1 gram of cocaine base to 3,571 grams of converted drug weight, the 189 grams of cocaine base received a converted drug weight 674.92 kilograms.  Using the same method, the remaining narcotics raised the total to 689.61 kilograms).

Seeing things otherwise, Figures says the district court should have converted the amount of cocaine base into powder cocaine, which would have given him a lower base offense level.  Why?  Because, Figures says, the district court should have complied with a now-rescinded Department of Justice memorandum counseling prosecutors to support a variance in the guidelines range that would eliminate any disparity between crack and powder cocaine.  *See* Att'y Gen. Merrick B. Garland, U.S. Dep't of Just., *Additional Department Policies Regarding Charging, Pleas, and Sentencing in Drug Cases*, (Dec. 16, 2022), https://perma.cc/9AFZ-4S3T; Att'y Gen. Pamela J. Bondi, U.S. Dep't of Just., *General Policy Regarding Charging, Plea Negotiations, and Sentencing*, https://perma.cc/WW3X-FYKK.  Here, Figures confronts a roadblock emanating from the separation of powers:  he fails to explain why the executive branch memorandum would bind the district court, whose focus is appropriately on the written Guidelines.  *Hymes*, 19 F.4th at 936; *see also Keller v. United States*, No. 17-1469, 2017 WL

5067391, at *2 (6th Cir. Oct. 10, 2017) (order) (recognizing that DOJ memoranda are not binding on the judiciary). While a district court may vary downward to account for any disagreement with the Guidelines as to the crack-powder disparity, it is not required to do so. *United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011). In any event, we note that the government, in keeping with the DOJ policy, did ask the district court to sentence Figures as if he were only responsible for powder cocaine, a position the district court adopted. Thus, the district court effectively gave Figures exactly what he is requesting. *See United States v. Carman*, No. 22-2073, 2025 WL 289701, at *3 (6th Cir. Jan. 24, 2025) (holding that when a court varies downward from an errant base offense level to capture a defendant's recommended guidelines range, any error is harmless).

Next, Figures argues that the narcotics found in his car should have been excluded in the total calculation. But those drugs amounted to just over two percent of the district court's calculation. Taking those narcotics out of the equation still leaves Figures miles above the amount needed to satisfy the base offense level. Guidelines, *supra*, § 2D1.1(c)(8); *Gill*, 348 F.3d at 155.

2. Lastly, Figures turns to the district court's refusal to apply a minor participant reduction under § 3B1.2 of the Sentencing Guidelines, a decision we review for clear error. *Mosley*, 53 F.4th at 963. All agree this provision would allow for a reduction if Figures was "substantially less culpable than the average participant" in the conspiracy offense, *id.*; Guidelines, *supra*, § 3B1.2 cmt. n.3(A)**,** a point Figures carried the burden to prove by a preponderance of the evidence, *United States v. Daneshvar*, 925 F.3d 766, 790 (6th Cir. 2019).

We see no clear error in the district court's denial of the reduction. Begin with a procedural flaw with Figures's argument. Namely, neither in district court nor here has Figures addressed the role of comparators or explained why he was substantially less culpable than his average coconspirator, as was his burden. *See Mosley*, 53 F.4th at 963. Nor, in any event, does the record reflect a minor role for Figures in the conspiracy. Figures regularly purchased powder cocaine from Duff, a central player in the conspiracy, and then sold the product to end users throughout Toledo, converting some of the product to crack cocaine along the way. Figures was thus instrumental in ensuring that the conspiracy's wholesalers had end purchasers. *See United*

*States v. Lewis*, No. 23-5242, 2024 WL 1463435, at *2 (6th Cir. Apr. 4, 2024) (holding defendant who arranged several exchanges with a known member of the distribution ring and then tried to resell the product did not play a "minor" role in the criminal scheme). All told, the district court committed no error in sentencing Figures.

IV.

That leaves Antuan Wynn, who, recall, sourced Duff with powder cocaine. Like his codefendants, Wynn challenges both his conviction and his sentence.

A.1. Starting with his conspiracy conviction, Wynn contends on appeal that a legally fatal variance existed between the proof at trial and the conspiracy allegations in the indictment, which charged a single drug conspiracy among 15 codefendants. Wynn argues that while he may have conspired to supply powder cocaine to Duff, who in turn sold that product to others, Wynn had nothing to do with other aspects of the alleged conspiracy, including the scheme to distribute fentanyl.

It bears emphasis at the start that Wynn's argument here differs from the one he presented below. In his Rule 29 motion in district court, Wynn argued that he was simply a "supplier," and that "[m]erely selling drugs to . . . Duff" could not establish his role in a conspiracy. As with Figures's sufficiency challenge, the district court rightly rejected Wynn's buyer-seller argument.

Consider the following. Wynn's sales to Duff were frequent, standardized, and of a sufficient quantity to infer more than a buyer-seller relationship. *See Mosley*, 53 F.4th at 960. Indeed, a relationship of trust imbued Wynn and Duff's interactions. *See Wheat*, 988 F.3d at 309. Duff and Wynn were childhood friends. Wynn fronted drugs to Duff and did not need to double-check that Duff was handing over the correct amount of cash. Duff even warned Wynn of any potential police activity that might disrupt their arrangement. That Wynn mainly interacted with Duff and did not directly convert the cocaine powder to crack does not diminish the broader nature or scope of the conspiracy in which the two participated. *See United States v. Character*, 76 F. App'x 690, 698 (6th Cir. 2003) (citing *United States v. Moss*, 9 F.3d 543, 551 (6th Cir. 1993) (recognizing that an individual conspirator need not know every other member or

be aware of all the discrete criminal activities that furthered the conspiracy). Especially so, it bears adding, when several recorded phone calls demonstrated that Wynn knew Duff was reselling Wynn's powder cocaine to others. Through Duff, Wynn interacted with Green, the other key player in the conspiracy, making it difficult for Wynn to feign ignorance as to the nature of the operation. *See United States v. Martinez*, 430 F.3d 317, 334 (6th Cir. 2005).

In the end, it was far from irrational for the jury to conclude that Wynn agreed to sell cocaine to Duff, who in turn would ensure that cocaine and crack reached others, including Figures and—through Green, the intermediary—Simpson. *See Wheat*, 988 F.3d at 306–07 (recognizing a conspiratorial agreement can be implicit and based on circumstantial evidence); *see also United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012); *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). Wynn thus played a necessary role in an interdependent criminal enterprise that operated just like any other business operation (save for its illicit purpose): a manufacturer of a product distributing the product to wholesalers and retailers until the product reached the consumer. *See* Wayne R. LaFave, 2 Subst. Crim. L. § 12.3(b)(2) (3d ed.). Such evidence plainly suffices to prove a chain narcotics conspiracy. *See, e.g.*, *United States v. Davenport*, 808 F.2d 1212, 1215–16 (6th Cir. 1987); *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982).

Wynn has shifted gears on appeal. All but conceding that he engaged in a conspiracy to traffic in cocaine, Wynn argues that evidence presented to the jury showed more than just a cocaine conspiracy and included a separate one involving fentanyl, amounting to reversible error. Specifically, says Wynn, there was a "different conspiracy to distribute" fentanyl, one that involved individuals he had "no knowledge of," meaning a prejudicial variance resulted between the indictment and proofs offered to the jury. For us to vacate his conviction, Wynn must show both that the evidence presented to the jury "only" demonstrated the existence of more than one conspiracy, *and* that the resulting variance prejudiced him. *United States v. Williams*, 612 F.3d 417, 423 (6th Cir. 2010). Putting preservations concerns to the side and spotting Wynn, for argument's sake, that the jury could only find the existence of two conspiracies, Wynn still cannot show prejudice.

To that end, Wynn speculates that the existence of two conspiracies confused the jurors and caused them to transfer guilt to him.  That theory, however, is in tension with the variance principle, which was derived primarily to ensure that an otherwise innocent defendant is not convicted of a conspiracy charge to which he could not prepare a defense.  *United States v. Solorio*, 337 F.3d 580, 590 (6th Cir. 2003).   In other words, any risk of purported guilt transference is necessarily nonprejudicial once the government proved Wynn's guilt as to at the cocaine conspiracy contemplated in the indictment, which all seem to accept is the case here. *See United States v. Robinson*, 547 F.3d 632, 643 (6th Cir. 2008) (citing *United States v. Lee*, 991 F.2d 343, 349 (6th Cir.1993)); *United States v. Mack*, 837 F.2d 254, 258 (6th Cir. 1988). *But see United States v. Guerrero*, 76 F.4th 519, 526 n.7 (6th Cir. 2023) (recognizing tension in our case law developing decades after *Mack* and *Lee*),

Even if we ignored this traditional approach, there was no prejudice in practice either. After all, there was no risk of jury confusion as to Wynn's responsibility in the conspiracy. Consider the evidence produced during the six-day trial.  Witnesses testified as to the conduct of a discrete set of individuals—the three on trial, as well as Green and Duff.  Among the three codefendants, the jury had ample grounds to distinguish among them.  For example, Figures had a less robust role to play than Wynn, and had next to nothing to do with fentanyl distribution. All of this places this case on par with *United States v. Carver*, 470 F.3d 220 (6th Cir. 2006), where we found no risk of juror confusion when a jury, after a one-week trial, was presented with three defendants with "conduct of approximately equal culpability" and only two possible conspiracies.  *Id.* at 237; *see also Guerrero*, 76 F.4th at 525 (cataloguing similar cases finding no prejudice).

True, the jury heard evidence of fentanyl trafficking involving one codefendant, Simpson. But it is difficult to believe that the jury was so moved by that evidence that it transferred Simpson's guilt to Wynn.  For one, there was damning evidence against Wynn as to the cocaine conspiracy, making it unlikely the jury would have looked to other proofs to find guilt. *Guerrero*, 76 F.4th at 527.  For another, the jury was instructed to "separately consider the evidence against each Defendant" and that their "decision on any one Defendant . . . should not influence [their] decision on any of the other Defendants."   Jury Instructions, R. 681-1,

PageID#6133. Because we presume the jury follows these instructions, *Richardson v. Marsh*, 481 U.S. 200, 206 (1987), we "must conclude that the jury did not improperly 'transfer guilt'" to Wynn, *United States v. Washington*, 565 F. App'x 458, 465 (6th Cir. 2014). In any event, Wynn's ultimate sentence, which turned on the cocaine he bought or sold to Duff, was not affected by any purported variance. *Guerrero*, 76 F.4th at 527. Simply put, no prejudice occurred.

Wynn offers little in response. He begins by comparing his case to *United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008). There, the indictment alleged one overarching conspiracy between Swafford and dozens of individuals who purchased iodine from him to cook methamphetamine. *Id.* at 838. We found a prejudicial variance occurred at trial because the evidence showed many smaller conspiracies along with a number of innocent interactions between Swafford and his customers. As a result, evidence of Swafford's guilt from some of his more incriminating interactions likely spilled over to imply guilt elsewhere, directly resulting in a longer sentence. *Id.* at 842–43. Wynn's trial, by comparison, was nowhere near as sprawling or confusing. Nor was there any no doubt as to Wynn's role in the cocaine conspiracy. *Cf. United States v. Dellosantos*, 649 F.3d 109, 125 (1st Cir. 2011) (finding prejudice from a complex conspiracy trial where "voluminous testimony"—specifically, hundreds of telephone conversations detailing the interactions of 16 different codefendants—was devoted to a separate conspiracy of which the defendants had no connection).

Wynn also emphasizes that he was acquitted of a cocaine distribution charge, surmising that the jury could only have convicted him of the supposed separate fentanyl conspiracy. But the not guilty verdict concerned a discrete event on or around November 12, 2020. Proof of that charge largely consisted of circumstantial evidence—namely, physical surveillance showing Wynn's arrival at Duff's residence soon after Green had sought more cocaine from Duff. The jury was fairly equipped to conclude that evidence beyond a reasonable doubt existed to support Wynn's conspiracy charge, but not the isolated November 2020 distribution charge. *See United States v. Alvarez*, 75 F. App'x 745, 747 (10th Cir. 2003) (order) (no inconsistency between differing verdicts as to a specific substantive offense and a broader drug conspiracy charge); *see also United States v. Colon*, 268 F.3d 367, 376 (6th Cir. 2001) (observing that it is possible to

conspire to violate drug laws without actually committing the offense themselves).  More telling as to the validity of the conspiracy charge, it seems, is the fact that the same verdict form specifically found Wynn guilty of conspiring to distribute more than 500 grams of cocaine.  It would be odd for the jury to so conclude if it thought Wynn was only conspiring as to other drugs.  Speculating otherwise has little point.  *Cf. United States v. Powell*, 469 U.S. 57, 65 (1984) ("It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.").  Doing so falls well short of a showing that any error here "substantially affected the 'overall fairness' of the trial," a necessary prerequisite to vacating Wynn's conviction.  *Guerrero*, 76 F.4th at 527–28 (citation omitted).

Lastly, Wynn hints at the existence of multiple *cocaine* conspiracies, highlighting that he was not Duff's only supplier.  But "the existence of multiple suppliers . . . does not result in multiple conspiracies," *United States v. Parlier*, 570 F. App'x 509, 514–15 (6th Cir. 2014), as competing suppliers still share in the "same drug-distribution objective," *see Washington*, 565 F. App'x at 465; *see also Martinez*, 430 F.3d at 334).  In sum, no prejudicial variance occurred.

2.  Wynn next challenges the legal accuracy of one of the jury instructions, a question we review de novo.  *United States v. Pritchard*, 964 F.3d 513, 522 (6th Cir. 2020).  By way of background, during his testimony, Wynn downplayed how often he sold cocaine to Duff, claiming that he instead repeatedly sold Duff benzocaine (a noncontrolled substance often sold under the brand name Orajel) to use as a "cut" to artificially increase the amount of cocaine Duff would have for resale. Following that testimony, the government sought an instruction to limit its import. The requested instruction stated:  "[i]t is immaterial whether a Defendant actually sold a controlled substance himself if he otherwise facilitated the sale."  Jury Instructions Before Closing Arguments, R. 681-1, PageID#6137.  Through the instruction, the government seemingly sought to preserve the ability to secure a guilty verdict against Wynn on the conspiracy charge whether he sold cocaine or benzocaine (or both) to facilitate Duff's drug trafficking.

We see no issue with the instruction. The "essence" of a drug conspiracy charge is an agreement to violate federal drug laws. *Wheat*, 988 F.3d at 306 (quotation omitted). And federal law, in turn, prohibits both distributing as well as aiding in the distribution of cocaine. 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. So the focus in drug conspiracy cases is whether there is an express or implicit "'meeting of the minds' that two or more people will jointly achieve a drug-distribution end." *Wheat*, 988 F.3d at 306–07. Because our focus is on evidence of an agreement, a defendant need not actually distribute narcotics to be guilty of drug conspiracy. *Colon*, 268 F.3d at 376; *United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009); *see also United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 180 (6th Cir. 1992) (recognizing that "defendants who agreed to distribute diluents with intent that they be used as cutting agents for heroin and which were distributed by one or more heroin networks could be convicted" for violating 21 U.S.C. § 846 (citations omitted)). This sentiment aligns with the jury instruction at issue, which appropriately turned the jury's attention away from whether Wynn distributed cocaine to whether there was evidence of an illicit agreement.

Wynn reminds us that evidence of drug sales can be relevant to a conspiracy charge. Yet he is wrong to contend that the instruction incorrectly told the jury to ignore all evidence of whether Wynn sold drugs. Rather, the instruction merely conditions the statement that evidence of drug sales is immaterial *if* there is other evidence that Wynn knowingly agreed to violate federal drug law. In other words, the instruction simply makes the anodyne statement that evidence of a drug conspiracy can arise from activities outside of actual drug dealing.

3. Wynn lastly argues that the district court should not have permitted the government to put on evidence about his drug purchases 18 months before the conspiracy began. To his mind, this evidence was used to demonstrate inadmissible prohibited prior bad acts under Rule 404(b). The district court rejected Wynn's argument on two alternative grounds. First, it viewed the evidence to be intrinsic to—or, said differently, part of the "res gestae" of—the offense and therefore not subject to Rule 404(b). Second, even if the Rule applied, the court deemed the evidence admissible under Rule 404(b)(2)'s exception for evidence of opportunity and intent. On appeal, Wynn challenges only the district court's conclusion that the evidence was intrinsic to the offense; he does not challenge the district court's alternative holding. In this circumstance,

our precedent requires holding that Wynn has forfeited his evidentiary challenge by not addressing an independent basis to reject the challenge, in this instance, the district court's Rule 404(b)(2) holding. *United States v. Kettles*, 970 F.3d 637, 646 (6th Cir. 2020).

Even then, says Wynn, the pre-conspiracy evidence should have been excluded on yet another basis—this time, Rule 403—because its "probative value" was "substantially outweighed" by risks of prejudice. But Wynn forfeited this argument too, in this instance by failing to develop it in his opening brief on appeal. He devoted only a sentence to the issue: "any potential probative value of the evidence was outweighed by the prejudicial inference that Wynn had conspired to sell drugs in the past and thus may have conspired to do so again." Appellant Br. 45. A "perfunctory" argument, it bears repeating, is no argument at all. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (considering "[i]ssues . . . adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," forfeited (alteration in original) (citation omitted)).

B.1. That leaves Wynn's challenges to his sentence. Like his codefendants, Wynn challenges the district court's drug quantity assessment. On that score, the district court, after adopting the government's position, assigned Wynn a base offense level of 30, finding at least 5 kilograms of cocaine attributable to Wynn. *See* Guidelines, *supra*, § 2D1.1(c)(5). The evidence the court relied on clears the "low bar" of providing a "plausible" connection between Wynn and that amount of cocaine. *Estrada-Gonzalez*, 32 F.4th at 614 (discussing clear error review of drug quantities).

Consider two moments from Duff's trial testimony. *See Mosley*, 53 F.4th at 962 (affirming role of coconspirator testimony in assessing drug quantity). Duff testified that from spring to the end of 2020, he acquired from Wynn nine-ounce (or .252 kilogram) quantities of cocaine "eight times," and half-kilogram quantities "five or six" times. Separately, Duff recounted an incident where he and Wynn pooled their money to acquire another kilogram of cocaine, which they would split. Intercepted contemporaneous phone calls recorded Duff discussing his split-a-brick sale with Wynn. While the government has other plausible bases to add to Wynn's attributable drug quantity, we can stop here. Even the most conservative

estimates gleaned from this evidence alone directly attributes five kilograms of powder cocaine to Wynn.

Wynn responds by portraying Duff as a liar and his testimony as imprecise.  But the district court observed the testimony and heard firsthand the corroborating wiretap conversations. We are in no position to second guess that court's credibility determinations on clear error review.  *See id*.  Wynn also suggests that the district court double counted the split-a-brick sale. We disagree.  The evidence clearly distinguishes between when Wynn would supply Duff with cocaine and a separate incident where they pooled their money to acquire cocaine from another source.

Wynn makes two other points.  First, he says the district court failed to sufficiently explain its findings on drug quantity.  But like his codefendants, Wynn never made this distinct argument in district court, so we review for plain error.  *Bradley*, 897 F.3d at 785.  And together, the district court's explanation (e.g., incorporating the government's sentencing memorandum), *Ward*, 68 F.3d at 150, coupled with the record, *Bradley*, 897 F.3d at 785, easily clears plain error review.

Second, Wynn takes issue with a tension between the district court attributing at least 5 kilograms of cocaine to him and the jury's finding that he conspired to traffic in less than that amount.  (Wynn, we note, does not argue that the jury's not-guilty finding on the drug distribution charge is relevant with respect to this argument.)  As a starting point, precedent forecloses any argument that this purported tension raises constitutional concerns.  *See United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc) (holding that a district court does not violate the Sixth Amendment by "looking to . . . acquitted conduct" in "selecting a sentence" within the statutory range envisioned by the jury verdict); *see also United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam).

What about § 1B1.3(c) of the Sentencing Guidelines?  For purposes of establishing a defendant's base offense level, that provision generally excludes from the definition of relevant conduct any acts for "which the defendant was criminally charged and acquitted in federal court."  Section 1B1.3(c), however, went into effect in November 2024, well after Wynn was

sentenced.  *See* U.S. Sent'g Guidelines Manual app. C, amend. 826 (U.S. Sent'g Comm'n 2024). And none of its provisions were made retroactive.  *See id.*; *see also* Guidelines, *supra*, § 1B1.10(a)(1), (d).  So it is of no benefit to Wynn.  *See Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013) ("[A] district court applies the version of the Guidelines in effect at the time of sentencing.").  Nor do we understand § 1B1.3(c) to merely clarify preexisting law.  Rather, it carved out a new exception to how courts should evaluate acquitted conduct and altered the legal effect of then-existing Guidelines.  *See United States v. Geerken*, 506 F.3d 461, 465 (6th Cir. 2007); *see also* U.S. Sent'g Guidelines Manual app. C, amend. 826 (U.S. Sent'g Comm'n 2024) (deleting from commentary reference to *United States v. Watts*, 519 U.S. 148, 154 (1997) and the statement that the "lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct").  Accordingly, we see no error in the drug quantity calculation.

2.  Wynn next challenges the district court's application of a two-level enhancement for possessing a firearm under § 2D1.1(b)(1).  That provision authorizes a two-level enhancement conditioned on two findings:  first, that Wynn possessed a "dangerous weapon," including a firearm; and second, that he did so during a drug trafficking crime.  *United States v. McCloud*, 935 F.3d 527, 531 (6th Cir. 2019).  If the weapon was present during the relevant conduct, the enhancement applies unless Wynn can show it was clearly improbable that the weapon was connected to the offense.  *United States v. Wallace*, 51 F.4th 177, 183 (6th Cir. 2022); *see also* Guidelines, *supra*, § 2D1.1(b)(1) cmt. n.11(A).  We review this fact-bound question for clear error, and otherwise "accord due deference" to the district court's decision to apply the enhancement.  *Wallace*, 51 F.4th at 183.

The district court did not clearly err in finding that Wynn had a firearm during his relevant conduct.  Wynn had control over this weapon, as evidenced by his guilty plea to possessing (as a felon) a black Ruger .38 revolver found at Wynn's Loxley Street home.  So all that was up for dispute at sentencing was the temporal element of the enhancement—whether Wynn's possession occurred during the relevant conduct.  Plenty of evidence suggested as much. In the midst of the charged conspiracy, the weapon was found next to Wynn's home surveillance system in a house that contained vast evidence of an active drug trafficking operation (e.g.,

various narcotics, digital scales, multiple cell phones, and vast quantities of cash). What is more, the home was used for drug trafficking between Wynn and Duff. Officers testified that they regularly saw Duff entering the Loxley residence during the height of the conspiracy. A GPS tracker on Duff's vehicle logged him traveling to Wynn's house nine times during that period. Duff likewise testified that he would obtain cocaine from Wynn at his residence. Taking all of this together, it was not a stretch (much less clear error) for the district court to conclude Wynn possessed the revolver during his drug trafficking crimes, a determination Wynn never rebutted as clearly improbable.

3. Finally, Wynn contends the district court erred in applying a two-level drug-premises enhancement under § 2D1.1(b)(12) with respect to his Loxley residence. The enhancement applies if Wynn "maintained a premises for the purposes of manufacturing or distributing a controlled substance." Guidelines, *supra*, § 2D1.1(b)(12); *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). According to the provision's application note, Wynn need not have maintained the premises for the sole purpose of distributing drugs. Guidelines, *supra*, § 2D1.1(b)(12) cmt. n.17. In other words, the enhancement applies if one of "the principal uses of the spaces [was] distributing" drugs, even if Wynn also "reside[d] at the premises." *Tripplet*, 112 F.4th at 432; *see also United States v. Terry*, 83 F.4th 1039, 1044 (6th Cir. 2023) (recognizing that the evidentiary bar to support the enhancement is "relatively low," with drug storage and transactions on the property typically sufficing).

Wynn's challenges on appeal are factual in nature. *See* Wynn Appellant Br. at 64 (asserting that the "evidence at trial did not show that Wynn regularly used his Loxley address to distribute drugs"). According, we apply clear error review. *See Tripplet*, 112 F.4th at 432 (applying clear error review to factual determinations with respect to the drug-premises enhancement). And we see no basis to conclude that the district court clearly erred in finding that Wynn distributed drugs at his Loxley residence. As discussed with the dangerous weapon enhancement, there exists considerable direct and circumstantial evidence that Wynn repeatedly dealt drugs to Duff within the residence. Layer on top of that Wynn's acknowledgement in his briefing that he stored drugs at Loxley. Confirming as much, officers found drugs at the residence, along with considerable drug trafficking paraphernalia. All of this easily satisfies the

low evidentiary bar to apply the enhancement.  *Terry*, 83 F.4th at 1044; *Tripplet*, 112 F.4th at 432.

\*     \*     \*     \*     \*

For the aforementioned reasons, we affirm the judgments of the district court.