NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0232n.06
Case No. 25-5216

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | May 26, 2026 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| RICARDO DAVALOS MARTINEZ, | ) |  |
| Defendant-Appellant. | ) |  |
|  | ) | OPINION |

Before: SUTTON, Chief Judge; BOGGS and RITZ, Circuit Judges.

SUTTON, Chief Judge.  Police arrested Ricardo Martinez along with dozens of other members of a wide-ranging drug-trafficking conspiracy.  At Martinez's trial, the government presented evidence that he served as a trusted assistant to the crime ring's leader, helping the organization sell drugs, keep records, and transfer money to Mexican drug cartels that served as the group's suppliers.  A jury convicted Martinez of several crimes.  He now challenges those convictions on multiple grounds.  We affirm.

I.

In March 2019, law enforcement officials learned that the Postal Service intercepted a suspicious package destined for a residence in Tennessee.  The package contained over ten pounds of drugs, including heroin, fentanyl, and methamphetamine.  The sender wrapped the drugs in plastic coated with motor oil in an apparent effort to evade detection by drug-sniffing dogs.  Given

the quantity of the drugs and the intricacy of the evasion tactics, the package looked like the work of a sophisticated drug-trafficking organization. Police opened an investigation.

The investigation revealed that Humberto Morales led the operation responsible for the package. Already convicted of several state-law crimes, Morales ran the operation from a Tennessee prison. Notwithstanding the limitations imposed by the prison's walls and presumed security, Morales built and maintained a wide-ranging narcotics distribution network. From his cell, he managed to use smuggled cellphones to coordinate drug sales, to direct wire transfers and cash drops, and to impose violent punishment on members of the ring who stepped out of line. Morales ran a tight ship. He once forced a disobedient member of the conspiracy to cut off the tip of his own finger while Morales watched via video call. His methods got results. Under Morales's prison-based leadership, the group's operations grew, eventually spreading to California and Mexico.

Ricardo Martinez knew Morales from their high school years, and the two classmates had become "really good friends." R.2375 at 135–36. Over time, Martinez became a trusted participant in Morales's drug-trafficking organization.

Martinez wore many hats in the organization. Sometimes, he played lookout. Martinez once drove a "tail car" to ensure that a courier safely (and without detection) transported ten pounds of methamphetamine across state lines. Martinez ably did the job, texting Morales when the courier exceeded the speed limit so that Morales could tell her to slow down. Other times, Martinez was a money man. He helped facilitate monetary exchanges, participating in several wire transfers and cash drop-offs. Morales in one instance entrusted Martinez with safekeeping $50,000 of "Culiacan's money," a reference to the city in Sinaloa, Mexico, where a major drug cartel operated. R.2377 at 126. Still other times, Martinez served as a human "safety deposit box."

2

R.2377 at 205. Morales trusted Martinez to maintain records that contained biographical and contact information for dozens of the conspiracy's members.

Above all else, Martinez served as Morales's right hand. Morales often assigned Martinez sensitive tasks, demonstrating the trust that existed between the two men. When Morales's wife needed a place to stay, Martinez found an apartment for her to rent. When Morales's sister wanted marijuana, Martinez delivered some to her so that she would not need to risk buying it on the street. And when Morales decided to find "the bitch" that "snitched on him" in the state criminal case that landed him in prison, Martinez hired a private investigator to locate her. R.2377 at 107, 210–11.

In March 2021, a federal grand jury issued an indictment that named 27 members in the conspiracy, including Martinez. The indictment charged Martinez with conspiring to sell drugs, 21 U.S.C. § 846, conspiring to launder money, 18 U.S.C. § 1956(h), and using communication devices to sell drugs, 21 U.S.C. § 843(b). Of the 23 co-conspirators police apprehended, only Martinez chose to go to trial. The rest, including Morales, pleaded guilty. *See, e.g.*, Order at 1, *United States v. Morales*, No. 24-5434 (6th Cir. May 15, 2025).

After a five-day trial, the jury convicted Martinez on each of the three counts. The district court sentenced him to 144 months.

## II.

On appeal, Martinez challenges his conviction in three ways.

*Sufficiency of the evidence.* Martinez contends that the government presented insufficient evidence to support his three convictions. We must affirm the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In assessing this argument, we "view the evidence

3

in the light most favorable to the government." *United States v. Getachew*, 157 F.4th 883, 887 (6th Cir. 2025).

The evidence presented at trial amply supported each conviction. Start with the drug-trafficking conspiracy charge. To prove a conspiracy under 21 U.S.C. § 846, the government needed to demonstrate that "two or more individuals [] agreed to violate a drug law" and that Martinez "knowingly and voluntarily entered into this agreement." *United States v. Mosley*, 53 F.4th 947, 956 (6th Cir. 2022) (quotation omitted). Such an agreement "need not be recorded or even express," *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021), and may "be inferred from [Martinez's] conduct," *Mosely*, 53 F.4th at 957. Once the government establishes the existence of a drug conspiracy, "the evidence linking an individual defendant to that conspiracy" need not be extensive. *United States v. Sadler*, 24 F.4th 515, 540 (6th Cir. 2022) (quotation omitted).

The government introduced considerable evidence of this drug-trafficking conspiracy. Law enforcement officials told the jury that they intercepted three packages of drugs en route to members of the conspiracy. Each package contained over a pound of drugs. Several members of the conspiracy testified about the various roles they played in selling those drugs, and they all pointed to Morales as the leader of the operation.

The government also linked Martinez to the conspiracy. Text messages from Morales established that Martinez knew about the operation's drug dealing. Martinez indeed played a vital role in the conspiracy. He tailed a drug delivery, sent money to drug suppliers, and kept records of the conspirators. He also bought cell phones for Morales to smuggle into prison, which allowed Morales to run the drug-distribution operation from his prison cell. All told, Martinez played an

integral part in this drug-trafficking organization, which allowed the jury to find that Martinez knowingly and voluntarily joined the conspiracy.

The evidence likewise supported Martinez's conviction for conspiracy to commit money laundering. To convict, the government needed to prove the existence of a money-laundering conspiracy that Martinez knowingly and voluntarily joined. *United States v. Matthews*, 31 F.4th 436, 447 (6th Cir. 2022). The crime of money laundering, in turn, "requires the government to prove that the defendant (1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) either intended to promote that unlawful activity or knew that the transaction is designed in whole or in part to disguise the source, ownership or control of the proceeds." *Id.* (quotations omitted). Martinez knowingly joined such a conspiracy. He knew that Morales sold drugs, including methamphetamine and fentanyl, because Morales told him as much. With that knowledge, Martinez helped Morales to wire money and to deliver large amounts of cash to his suppliers, all the while aiding Morales's efforts to further his trafficking.

The evidence tells a similar story about the charge for using a communication facility to sell drugs. To prove a violation of 21 U.S.C. § 843(b), the government needed to prove three elements: "(1) a knowing or intentional (2) use of a communication facility (3) to facilitate the commission of a drug offense." *United States v. Dotson*, 871 F.2d 1318, 1321 (6th Cir. 1989). Of necessity, Martinez (who was not in jail) communicated with Morales (who was in jail) by cellphone. A cellphone is a communication facility. 21 U.S.C. § 843(b); *see Wheat*, 988 F.3d at 312. Martinez thus used a communication facility each time he helped Morales to commit a drug offense. When Martinez, for example, tailed a courier as she transported ten pounds of methamphetamine, he texted Morales to let him know that the courier was speeding. Morales then

told the courier to slow down, thus facilitating the successful delivery of drugs by avoiding police scrutiny. Because Martinez used a cellphone to sell drugs, the jury acted reasonably in convicting him.

In the last analysis, sufficient evidence introduced at the trial supported all three counts.

Martinez resists this conclusion, arguing that he did not know about Morales's drug dealing and that he lacked a common purpose with Morales and his drug-distribution teammates. The premise of Martinez's argument is right. If a defendant does not know the common goal of a conspiracy, we will not find that he knowingly joined it. *See United States v. Smith*, 320 F.3d 647, 653 (6th Cir. 2003); *United States v. Patel*, 579 F. App'x 449, 461 (6th Cir. 2014). But the conclusion is wrong. Martinez offers no reason to believe that he lacked knowledge of Morales's drug-peddling mission.

Martinez points to testimony from the drug courier that he tailed, claiming she testified that he "did not know what was in [her] car." Appellant's Br. 20. But she said no such thing. The courier instead testified that she "didn't discuss" the drugs with Martinez because she "just assumed he probably knew" about them. R.2376 at 195. Taking the evidence in the light most favorable to the government, this testimony hurts Martinez more than it helps him. The courier already had plenty of reasons to believe that Martinez knew about the drugs in her car. Why else was he tasked with following her? Keep in mind that an incarcerated man (Morales) had hired Martinez to follow the car and paid him $240 and "two blunts" for the job. R.2376 at 132. Surely Morales and Martinez did not develop this elaborate plan solely for the good-government purpose of ensuring that the courier obeyed the traffic laws. The jury could reasonably infer that Martinez understood the nature of his assignment based on the context of the assignment alone. Martinez's

actions during the drive—letting Morales know the courier was speeding and needed to slow down—cement the conclusion that Martinez knew about the drugs.

Even if Martinez (implausibly) did not know about the drugs in the car, Morales texted him later that day to offer him an opportunity to sell methamphetamine and fentanyl. From that point on, Martinez knew directly from the source that every time he helped Morales, those actions furthered Morales's drug trade. Most of the evidence that the government presented about Martinez's participation in the conspiracy reflects conduct that occurred after this supposed revelation. *See, e.g.*, R.2377 at 121–22 (agreeing a few days later to assist Morales in finding a house where he could ship "weed and . . . other sh[]t"); *id.* at 100, 133–36, 152–54 (participating around five months later in several wire transfers and cash drop-offs); *id.* at 74–75 (purchasing cellphones for Morales around nine months later). This evidence sufficed to support Martinez's drug-conspiracy conviction.

*Variance.* Martinez claims that the evidence introduced at trial varied from the accusations in the indictment, and that the difference between the two prejudiced him. This kind of error is "often raised but seldom seen." *United States v. Williams*, 612 F.3d 417, 423 (6th Cir. 2010). A variance occurs where "the terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Guerrero*, 76 F.4th 519, 524 (6th Cir. 2023) (quotation omitted). In the context of a conspiracy, a variance is "fatal," and thus requires reversal, "only if (1) the indictment alleged one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, and (2) the variance prejudiced the defendant." *Williams*, 612 F.3d at 423 (quotation omitted). Because Martinez did not raise this issue at trial, we review it only for plain error. *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006).

The district court did not err (let alone plainly err) because no variance occurred. Each of the co-conspirators who testified described Morales as calling the shots. Martinez, too, took orders from Morales. Because each member of the group operated under the same command-and-control structure, the jury could reasonably find the existence of a single conspiracy. That suffices to defeat Martinez's claim, especially on plain-error review. *See United States v. Williams*, 998 F.3d 716, 730–32 (6th Cir. 2021).

Martinez fights this bottom line by insisting that Morales established several small conspiracies, each involving a few people and each operating without knowledge of the others. But Martinez's argument comes up short for at least two reasons. One is that a "single conspiracy does not become multiple conspiracies simply because" some co-conspirators "did not know of or become involved in all of the activities in furtherance of the conspiracy." *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982). The other reason is that, even if the evidence showed only multiple conspiracies, any variance did not prejudice Martinez. "[I]f the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." *United States v. Robinson*, 547 F.3d 632, 642–43 (6th Cir. 2008) (quotation omitted). Even if we permit Martinez to carve up the overarching conspiracy in as many ways as he wishes, he cannot escape his role in at least one of the miniature conspiracies that remain. No plain error occurred.

*Intrinsic evidence.* Martinez challenges the district court's decision to admit evidence that he hired an investigator to locate a witness who previously testified against Morales. According to Martinez, this testimony violated Evidence Rule 404(b)'s prohibition on evidence "of any other crime, wrong, or act" when used to prove "a person's character" and to establish that "the person

acted in accordance" with that character. Fed. R. Evid. 404(b). We review this evidentiary ruling for abuse of discretion. *United States v. Simpson*, 138 F.4th 438, 448 (6th Cir. 2025)

Rule 404(b) "does not apply" when evidence is "intrinsic to the crime charged." *Id.* (quotation omitted). Evidence that "establish[es] how members of a conspiracy are related," *United States v. Pierce*, 62 F.3d 818, 829 (6th Cir. 1995), and that describes events that "happened in the middle of the charged conspiracy" fits that bill, *Simpson*, 138 F.4th at 448. Martinez's efforts to help Morales to find the witness occurred while the drug-trafficking conspiracy existed. And the testimony illuminated the relationship between the two co-conspirators. At trial, Martinez defended himself on the ground that he did not know Morales well and that he cut off all contact with Morales once he realized the scope of Morales's illegal activities. The district court did not abuse its discretion in admitting this evidence to clarify the true nature of the relationship between Martinez and Morales.

We affirm.