NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0271n.06

Case No. 25-5634

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 23, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) | |
| | ) | |
| ULRICK UNCEL BROWN, | ) | |
| Defendant - Appellant. | ) | O P I N I O N |
| | ) | |

Before: SUTTON, Chief Judge; McKEAGUE, and BUSH, Circuit Judges.

**McKEAGUE, Circuit Judge**. Ulrick Brown, in conjunction with his coconspirators, orchestrated large-scale methamphetamine transactions throughout Tennessee and Georgia. He arranged methamphetamine deliveries for accomplices and personally traveled across state lines to acquire multiple kilograms of methamphetamine. For his involvement in this regional drug ring, Brown pled guilty to Conspiracy to Distribute Methamphetamine (Actual) in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846.

The district court sentenced Brown to 240 months in prison after finding that he was responsible for trafficking at least 1.5 kilograms, but less than 4.5 kilograms, of "actual" methamphetamine. On appeal, Brown argues that his sentence should be reduced because there was insufficient evidence to conclude that he trafficked at least 1.5 kilograms of "actual" meth. He also argues that the district court failed to adequately explain why it denied his motion for a

downward variance, and that his sentence was substantively unreasonable. Because we disagree with Brown, we **AFFIRM** his sentence.

## I. BACKGROUND

### A. Factual Background

Inmates at Riverbend State Prison in Georgia ran a drug ring that moved methamphetamine between Georgia and Tennessee. The inmates would coordinate with associates outside of prison to orchestrate drug transactions. One of those associates was Defendant Ulrick Brown. Brown connected with the ring leaders while in jail for a separate offense, and once he was released, he began facilitating methamphetamine deals on their behalf.

One of those transactions took place on the day Brown was released from custody, May 16, 2022. Brown met up with Amanda Jacks—his romantic partner who was also involved in the drug ring—to travel to Georgia to obtain two kilograms of methamphetamine and an assortment of pills. Brown and Jacks then drove back to Tennessee to deliver the drugs to an accomplice who worked with the drug ring. For their trouble, they were compensated with ounces of methamphetamine and cash.

Apart from this trip to personally obtain methamphetamine, Brown also helped coordinate other transactions as a mid-level distributor. Brown arranged some methamphetamine deliveries for the drug ring, and he also let coconspirators use his car for other drug transportation. Brown knew that these accomplices were using his vehicle to transport methamphetamine, and he knew it was in furtherance of the drug ring's operations.

On June 22, 2022, Brown was arrested while en route to a methamphetamine transaction that was initiated by a confidential informant. Officers found a small amount of marijuana in Brown's car, and after he was transported to jail, officers found a small amount of a crystal substance in the backseat of the patrol vehicle, where Brown had been sitting.

After many of his coconspirators (including Jacks) started cooperating with law enforcement officers, Brown decided to do the same. He consented to an interview with investigators, waived his *Miranda* rights, and admitted to his involvement in the drug ring. He explained that he was part of a conspiracy to move drugs throughout Georgia and Tennessee, and he confirmed that he personally traveled with Jacks to pick up two kilograms of methamphetamine. He also admitted to letting others use his car for methamphetamine transactions, and he discussed some of his coconspirators' other activities that furthered the drug ring's operations.

### B. Procedural History

Brown was charged with Conspiracy to Distribute 50 Grams or More of Methamphetamine (Actual) and 500 Grams or More of a Methamphetamine Mixture. He pled guilty to the lesser included offense of Conspiracy to Distribute Methamphetamine (Actual). The United States Probation Office prepared a presentence investigation report to make an initial calculation of Brown's Sentencing Guidelines range. Brown's recommended range of incarceration would depend, in part, on the quantity and quality of drugs he conspired to distribute. *See* U.S.S.G. § 2D1.1(c).[1] The report attributed between 1.5 kilograms and 4.5 kilograms of "actual" methamphetamine to Brown. This attribution, which produced a Base Offense Level that the Probation Office described as a "conservative estimate," accounted for the two kilograms of methamphetamine that Brown transported on his trip to Georgia with Jacks. Addendum to PSR, R.524 at PageID 3470.

At his sentencing hearing, the district court entertained objections to the presentence investigation report, and Brown objected to the drug calculation. Specifically, Brown objected to the presumed purity of the methamphetamine. Brown argued that because law enforcement officers were unable to test the methamphetamine that he obtained on his trip to Georgia with

---

[1] References to the Sentencing Guidelines refer to the 2024 version, which was in effect when Brown was sentenced.

Jacks, the district court should give him "the benefit of the doubt," and the drugs should be considered a "mixture instead of actual" methamphetamine. First Sentencing Hr'g Tr., R.559 at PageID 3785.

In response, the Government argued that the attribution was correct. The Government noted that there was sufficient evidence to conclude that Brown distributed over 1.5 kilograms of "actual" methamphetamine, pointing to (1) statements from coconspirators that discussed the high potency of the methamphetamine from the drug ring's other transactions, and (2) the lab test results of four other methamphetamine samples that were confiscated from the drug ring's activity showing methamphetamine with 93% purity, 91% purity, 90% purity, and 94% purity, respectively. And, as the Government noted, the coconspirators caught with methamphetamine that had 91% purity and 90% purity stated that they received their drugs from Brown and Jacks.

The district court ruled in favor of the Government and found that the drug calculation was accurate. Citing the "specific evidence in the presentence report that indicates the quantity of the drugs and also the quality of the drugs that were used" in the conspiracy, and also noting a general observation that the Tennessee methamphetamine market had been saturated with high potency drugs, the district court determined that there was sufficient evidence tying Brown to more than 1.5 kilograms of "actual" methamphetamine. First Sentencing Hr'g Tr., R.559 at PageID 3785-89.

With the Guidelines range established at 235-240 months (capped at the 20-year statutory maximum sentence), Brown started to second-guess his decision to plead guilty. After a colloquy in which he downplayed his role in the conspiracy, Brown decided to withdraw his guilty plea and seek a new lawyer. The district court continued the sentencing hearing to let Brown think through his options with the advice of counsel.

When Brown returned for his second sentencing hearing, he was represented by new counsel and ready to maintain his original guilty plea. After the district court explained that it would stick to its prior rulings about the drug calculation and the Sentencing Guidelines, Brown moved for a downward variance. Brown cited four reasons to support his motion: (1) a within-

4

Guidelines sentence would create a disparity compared to his codefendants, (2) a within-Guidelines sentence would create a disparity compared to national averages, (3) he only participated in the conspiracy for a short amount of time, and (4) he eventually made a cooperative statement to assist law enforcement officers in their investigation of the drug ring. The Government briefly responded to Brown's arguments, acknowledging that he gave a cooperative statement to law enforcement officers.

Consulting the factors outlined in 18 U.S.C. § 3553(a), the district court denied Brown's motion, explaining that a within-Guidelines range was appropriate. The district court put considerable weight on Brown's extensive criminal history, the serious nature of the crime, and the harm Brown imposed on the community. The district court also emphasized deterrence: "people standing in Mr. Brown's shoes who may want to make some quick money by selling drugs should be deterred from engaging in that conduct because of what happens to Mr. Brown." Second Sentencing Hr'g Tr., R.602 at PageID 4293.

The district court announced Brown's 240-month sentence and asked each party if they had "any objection to the sentence the Court just announced." *Id.* at PageID 4299, 4303. Brown said no.

Brown now appeals his sentence, raising three issues. First, he challenges the district court's finding that the drugs he conspired to distribute contained at least 1.5 kilograms of "actual" methamphetamine, noting that the drugs he personally obtained in Georgia were never tested. Second, he argues that the district court did not adequately explain its decision to deny his motion for a downward variance. Third, he suggests that his sentence was substantively unreasonable. We take each challenge in turn.

## II. DRUG PURITY FINDING

Brown first challenges the district court's finding related to drug purity. Brown does not dispute that he is responsible for the two kilograms of methamphetamine that he admitted to

obtaining in Georgia on behalf of the drug ring; he merely argues that the district court did not have sufficient evidence to determine that he was responsible for at least 1.5 kilograms of "actual" meth.

The Sentencing Guidelines categorize methamphetamine by its quantity and quality. "Methamphetamine (actual)" refers to the "weight" of meth contained in a mixture. U.S.S.G. § 2D1.1(c) cmt. (B). It is calculated by multiplying the purity of the drug detected by the weight of the overall mixture. *Id.* For example, 10 grams of a mixture that contains methamphetamine at 50% purity equates to 5 grams of methamphetamine (actual). *Id.* "In the case of a mixture" of methamphetamine, courts are directed to use either the entire weight of the mixture or the calculation of methamphetamine (actual), whichever results in a greater offense level. U.S.S.G. § 2D1.1(c) cmt. (B). Here, Brown's Guidelines range turns on whether he distributed between 1.5 kilograms and 4.5 kilograms of methamphetamine (actual).

A district court's conclusions about drug quantity and purity are factual findings subject to clear-error review. *United States v. Reed*, 72 F.4th 174, 190 (6th Cir. 2023). "A factual finding is clearly erroneous only where, after considering all the evidence, the court is 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Sands*, 4 F.4th 417, 420 (6th Cir. 2021)).

The Government "must prove the weight of the drugs" attributable to Brown "by a preponderance of the evidence." *United States v. Simpson*, 138 F.4th 438, 446 (6th Cir. 2025). This includes drugs for which Brown "was 'directly involved' in trafficking," but "it can also include other narcotics, such as those that were 'reasonably foreseeable' to him to be distributed as part of the conspiracy." *Id.* (quoting *United States v. Gardner*, 32 F.4th 504, 524 (6th Cir. 2022)). A district court can "sentence a defendant for conspiracy-wide drug quantities so long as it "make[s] 'particularized findings as to why it is doing so.'" *Reed*, 72 F.4th at 191 (quoting *United States v. McReynolds*, 964 F.3d 555, 564 (6th Cir. 2020)).

Importantly, the district court is not left without recourse if the specific drugs attributable to the defendant were unavailable for lab testing. "[T]he district court can make a reasonable estimate" on drug quantity or quality "based on physical evidence or testimony" so long as "the evidence underlying the district court's estimate . . . ha[s] a minimal level of reliability." *United States v. Hawkins*, 165 F.4th 442, 451 (6th Cir. 2026) (quoting *United States v. Histed*, 93 F.4th 948, 955 (6th Cir. 2024); *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004)); *see also United States v. Price*, 761 F. App'x 568, 571 (6th Cir. 2019). For example, this Court has held that a district court can extrapolate the purity of methamphetamine by referencing lab test samples of different methamphetamine that came from the same supplier. *United States v. Ibarra*, No. 24-5174, 2025 WL 1542319, at *10 (6th Cir. May 30, 2025); *see also United States v. Jackson*, 470 F.3d 299, 310-11 (6th Cir. 2006) (endorsing similar extrapolation of cocaine purity).

Here, the Government was unable to test the precise drugs that Brown obtained on his trip to Georgia. So the district court was free to extrapolate from reliable evidence. And that's precisely what the district court did. The district court noted specific, reliable evidence in the record, like samples of methamphetamine confiscated from Brown's coconspirators. The lab test results from those samples established purity ranging from 90%-94% methamphetamine. And, for two of those samples, the coconspirators whose drugs were tested stated that they got their supply from Brown and Jacks.[2] With evidence directly tying Brown to at least 2 kilograms of methamphetamine that was, at minimum, 90% pure, the district court did not err (let alone clearly err) by extrapolating that Brown was responsible for distributing at least 1.5 kilograms of methamphetamine (actual). *See* U.S.S.G. § 2D1.1(c) cmt. (B).

---

[2] Brown challenged the accuracy of the coconspirators' statements in the presentence investigation report that connected him to the high potency methamphetamine; he claimed that his coconspirators received their methamphetamine solely from Jacks. But the district court adopted the factual account as it was articulated in the report. And Brown did not challenge that finding on appeal. Still, even taking Brown's account at face value, because Brown made clear that Jacks was also *his* source of methamphetamine, tying Jacks to methamphetamine with over 90% purity does not help his attempt to avoid a connection to high-purity meth. *See Ibarra*, 2025 WL 1542319, at *10.

Brown's challenge ignores much of the district court's rationale. He argues that the district court improperly extrapolated the drug purity and should not have relied on prosecutors' general observations about the high-purity methamphetamine that has flooded the Tennessee market. Notably, had the district court relied solely on these general observations about the Tennessee drug market, and nothing more, it may have clearly erred. *See Reed*, 72 F.4th at 190-93. But here, the district court relied on "specific evidence in the presentence report that indicates the quantity of the drugs and also the quality of the drugs that were used" in Brown's conspiracy. First Sentencing Hr'g Tr., R.559 at PageID 3788. And this evidence—lab tests from methamphetamine samples tied to Brown, Brown's supplier, and Brown's coconspirators—was reliable enough to establish the purity of the drugs Brown transported from Georgia to Tennessee.

### III. DENIAL OF DOWNWARD VARIANCE MOTION

Next, Brown challenges the sufficiency of the district court's explanation in denying his motion for a downward variance. In particular, Brown argues that the district court erred by not specifically referencing one of his several proposed reasons that purportedly justified a downward variance: his cooperation with law enforcement.

When a defendant raises a procedural reasonableness challenge—like Brown's "inadequate-explanation argument"—we typically review it for an abuse of discretion. *United States v. Judge*, 649 F.3d 453, 457-58 (6th Cir. 2011). However, "where a defendant asserts a procedural error on appeal that was not raised below when prompted by the district court in accordance with *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004), our review is limited to determining whether the sentencing court committed plain error." *Id.* at 457.

Brown never objected to the district court's explanation. After denying the motion for a downward variance, the district court asked Brown's counsel if he had anything further to say on Brown's behalf. Counsel made no objections. Then Brown spoke, reading a letter he wrote the district court. No objections there. And, after announcing Brown's sentence, the district court

asked each party if there were any additional objections. Brown and his counsel said no. Because Brown did not object to this perceived procedural error, plain-error review applies. *Id.* at 457-58; *see also United States v. Messersmith*, 164 F.4th 523, 528 (6th Cir. 2026).

To succeed on plain-error review, Brown "must point to an '(1) error (2) that was obvious or clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Haile*, 157 F.4th 820, 830 (6th Cir. 2025) (alteration in original) (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)). "'Only in exceptional circumstances,' when an error 'is so plain that the trial judge was derelict in countenancing it' will we find plain error." *Id.* (quoting *Vonner*, 516 F.3d at 386).

Brown offered several reasons that, in his mind, justified a downward variance. And, as noted above, the district court failed to explicitly reference only one of them—Brown's cooperation with law enforcement—in its explanation for denying Brown's motion.

Brown's four proffered justifications for the downward variance fit neatly into two main arguments. The first: a within-Guidelines sentence would create disparities. The second: his specific conduct (i.e., only participating in the conspiracy for a short amount of time and eventually making a cooperative statement to assist law enforcement officers) mitigated the harm he caused to society.

The district court covered all of that ground as it denied Brown's motion. The district court recognized "all of the statistics that ha[d] been furnished to the Court" regarding disparities, but it clarified that "every individual case is different." Second Sentencing Hr'g Tr., R.602 at PageID 4294. And due to Brown's specific criminal history, the district court determined a downward variance would not advance the purposes of sentencing. The district court also rejected Brown's attempts to downplay the harm he caused to society. Even though Brown's participation in the conspiracy was short-lived in terms of duration, the district court measured the harm Brown caused by looking to the amount of drugs he trafficked throughout his community. The district court did not explicitly announce that Brown's cooperation with law enforcement failed to move the needle.

9

But this omission does not amount to plain error. *See Judge*, 649 F.3d at 458-59. Our "inquiry is 'whether the record makes clear that the sentencing judge listened to each argument, considered the supporting evidence, was fully aware of the defendant's circumstances, and took them into account in sentencing him.'" *Id.* at 458 (brackets omitted) (quoting *Vonner*, 516 F.3d at 387). And even though "[t]he district court is required to *consider* each argument," it need not "carve out and separately analyze each supporting statement." *Id.* at 459 (emphasis added).

Importantly, the district court did explain that Brown's attempts to minimize his role in the conspiracy were unpersuasive. And, by emphasizing the need to impose a term of imprisonment that (1) promotes respect for the law, and (2) deters others from resorting to similar crimes, the district court made clear that Brown's purportedly minimal role in the conspiracy, and his post-crime cooperation, did not justify a downward variance. Brown's corroborative statements to law enforcement officers did not undo the harm he caused. In reviewing the district court's explanation, it is clear that "the district court considered the core thrust of all of the arguments that [Brown] actually presented," so the "explanation of its sentence was adequate." *See id.* at 460.

## IV. SUBSTANTIVE REASONABLENESS

Finally, Brown suggests that his sentence was substantively unreasonable. "For a sentence to be substantively reasonable, it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of [18 U.S.C.] § 3553(a)." *United States v. Gates*, 48 F.4th 463, 476-77 (6th Cir. 2022) (quoting *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008)). A defendant challenging the substantive reasonableness of his sentence is "claim[ing] that [the] sentence is too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). "It's a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Id.* Because sentencing "is a matter of reasoned discretion, not math," we apply a "highly deferential" standard of review. *Id.* "We may reverse only if we find that the court abused its significant discretion."

10

*United States v. Thomas*, 933 F.3d 605, 613 (6th Cir. 2019) (citing *United States v. Lanning*, 633 F.3d 469, 473-76 (6th Cir. 2011)). "Indeed, we presume that a within-Guidelines sentence is reasonable." *United States v. Householder*, 137 F.4th 454, 485 (6th Cir. 2025) (per curiam).

> The entirety of Brown's substantive reasonableness argument is as follows:

> [T]he district court was substantively unreasonable in placing undue weight on assumptions regarding purity, which produced an unreasonable sentencing range. . . . However, even if the Court finds that the district court's process was procedurally reasonable, the length of Mr. Brown's sentence was substantively unreasonable. The court's failure to give any credit or variance at all due to his statements that were timely, corroborated, risk-bearing, and helpful, makes his sentence "greater than necessary" to achieve the sentencing goals set forth in § 3553(a).

Appellant Br. 19, 24, D.13.

Brown attempts to reframe his procedural reasonableness challenges as substantive reasonableness challenges; his efforts are unavailing. To start, "[a] party may not present a skeletal argument, leaving the court to put flesh on its bones." *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019) (quoting *Ruffin v. Cuyahoga County*, 708 F. App'x 276, 278 (6th Cir. 2018)). But even excusing the conclusory nature of Brown's brief argument, it does not even allude to which factors received disproportionate attention from the district court. Brown has not overcome the presumption of reasonableness for his 240-month within-Guidelines sentence.

## V. CONCLUSION

For these reasons, we **AFFIRM** Brown's sentence.